## WILSON v. THE STATE.

1. There being some direct evidence on all the essential elements of the crime charged, the failure of the judge to charge the jury on the law of circumstantial evidence does not furnish cause for a new trial.
2. The instruction given by the court defining malice, considered in its entirety, was not error.
3. The charge of the court complained of in the corresponding division of this opinion is in accord with the decision of this court in the case of *Mann* v. *State*, 124 *Ga.* 760 (53 S. E. 324, 4 L. R. A. (N. S.) 934).
4. Under a proper construction, the excerpt from the charge, set out in the fifth ground of the motion for new trial, did not amount to an expression of an opinion upon the facts in the case.
5. The charge of the court excepted to in the sixth ground of the amended motion, complaining that the court unduly restricted the defense relied on by the defendant, when considered in connection with the entire charge on that subject, was not erroneous.
6. The charge of the court set out in the corresponding division of this opinion was not appropriate; but as the judgment refusing a new trial will be reversed on other grounds, no ruling will be made as to whether the charge complained of was sufficient to require a new trial.
7. The court did not err in admitting evidence set out in the corresponding division of this opinion, over the objections interposed to its admission.
8. On the trial, one defense being that the accused shot and killed the deceased under the fears of a reasonable man that his own life was in danger, and there being evidence in behalf of the accused tending to show that at the time of the homicide the deceased had a pistol which

22

was found by his body, partially out of his pocket, from which it might be inferred that the deceased had attempted to draw the pistol, and there being other evidence in the nature of res gestæ which was admitted without objection, tending to show that the deceased was the aggressor, it was erroneous to reject evidence offered by the defendant, tending to show that the deceased ever since the previous difficulty between the parties had habitually carried a pistol, and that this was known to the accused. The rejected evidence was also admissible for the jury to consider and determine whether the carrying of a pistol by the deceased, under the circumstances, was or was not in the nature of an implied threat.

9. The evidence set out in the corresponding division of this opinion was irrelevant, and the court should have rejected it.

10. As a new trial will result on account of errors hereinbefore pointed out, it is unnecessary to deal with other grounds of the motion for new trial, based on alleged newly discovered evidence.

No. 2538. December 13, 1921.

Indictment for murder. Before Judge Gower. Wilcox superior court. March 3, 1921.

J. C. Wilson was convicted of the murder of R. E. Sappington, by shooting him with a pistol. The bill of exceptions assigns error on the judgment of the court refusing the defendant a new trial. The homicide occurred in a small frame building used as a post-office in the town of Seville. The building faced directly on a street and extended back in the lot on which it was situated. The front part of the building was separated from the rear part by a partition in which was a door. The front part had formerly been used as a store, but was vacant at the time of the tragedy. The rear part of the building was used as the post-office. A partition was constructed in the rear part, lengthwise with the building, in such manner as to cut off the post-office proper on the right, leaving the remainder of the space on the left, which was used as a "lobby." There was a door on the left side of the building opening into the "lobby," so that there were two entrances to the post-office, one opening directly into the lobby and the other through the front part of the building, as above indicated. In the partition which separated the post-office from the lobby, and directly in front of the side door, was a box in which letters could be deposited to be sent off in the mails. To the left of this box was a series of letter-boxes rented to individuals for reception of their incoming mail. These boxes were locked and unlocked by combination locks. The deceased, who was a cashier of a bank, had one of the boxes in the lower tier. In the vacant storeroom was a " counter " near the

left wall, which extended from near the front door of the building to near the partition which separated the store from the rear part of the building. The house was so arranged that a person seated on the sidewalk, with his back to the street and facing the building, looking through the front door would have a vision of the store, the counter, the door in the partition, the lobby, the letter-boxes, and any person who might be in the lobby mailing letters or getting his mail from his individual box. The homicide occurred in the lobby late in the afternoon on August 23, 1920, the deceased having gone there, as it was his custom to do after the bank had closed, to mail his letters and get his incoming mail. There had been a previous difficulty between the deceased and the accused on June 28, 1920, at the bank in which the deceased was cashier, growing out of previous matters of dispute. Mrs. Alma Mashburn, the postmistress, introduced as a witness for the State, testified, that she was sitting in front of the building looking back through the front part of the building into the lobby of the post-office, and had such view of the place as is described above; that a few minutes before the shooting occurred the defendant passed by her into the building and sat on the counter. She could not say whether he was reading his mail or not. From where he was sitting, a person coming in the side door to the post-office could not see him, but he could hear any one entering that door. Witness saw Sappington enter the lobby of the post-office from the side door, walk to the letter-box and mail some letters, and then he "stepped to his box to get his mail." As Sappington entered the door: "Wilson looked around towards the door; he just leaned over like that. . . Wilson got down off the counter and went through the door, and there was a gun fired immediately. I did not see Mr. Sappington after Mr. Wilson stepped between me and him. . . The pistol shot as soon as he stepped through the door. When he got off the counter Mr. Wilson first seemed to walk kinder natural until he got to the door, and then he made a quick step, and that scared me and I jumped up, and before I could turn and run the gun fired. . . I didn't hear a word from either of the men. When Mr. Wilson stepped between me and Mr. Sappington, made that quick step, Mr. Sappington was unlocking his box, which locked with a combination — you didn't have to have a key." Another witness testified that he ran immediately to the scene upon hearing

the shooting, and found the deceased and the accused alone in the lobby, the former being in a dying condition, and the latter standing by him, in the act of reloading his pistol. " The pistol was lying with two or three inches of the barrel . . in Mr. Sappington's pocket; the cylinder was out entirely."

It was contended by the defendant that his presence at the post-office at the time of the homicide was casual and in the course of his regular business; that he sat on the counter for the purpose of reading his mail, and was not expecting to see deceased; that upon meeting the deceased, the latter commenced the difficulty, and the former killed him in self-defense. Other facts will sufficiently appear in the opinion.

*McClellan & Jacobs, M. B. Cannon,* and *Hal Lawson,* for plaintiff in error.

*R. A. Denny, attorney-general, J. B. Wall, solicitor-general, Graham Wright, asst. atty.-gen., John P. Ross, Watts Powell,* and *Jesse Grantham,* contra.

ATKINSON, J. 1. Complaint is made because the judge failed to charge the provision of the Penal Code, § 1010, viz.: " To warrant a conviction on circumstantial evidence, the proved facts must not only be consistent with the hypothesis of guilt, but must exclude every other reasonable hypothesis save that of the guilt of the accused." In *McElroy* v. *State,* 125 *Ga.* 37 (53 S. E. 759), it was said: " Generally, where the prosecution relies exclusively upon circumstantial evidence for a conviction, it is the duty of the judge not only to charge upon the law of reasonable doubt, but also, whether requested or not, to state to the jury the rule of law applicable in such cases, to the effect that the evidence must connect the accused with the perpetration of the alleged offense, and must not only be consistent with his guilt but inconsistent with every other reasonable hypothesis." The above principle of law is not applicable to a defense set up by the accused where all the evidence to support that defense is circumstantial, for the reason that it would be against the interest of the defendant to hold him to the rule that the circumstances relied on to sustain his defense must be so conclusive as to exclude every reasonable hypothesis save that of the guilt of the accused. He would be entitled to acquittal if the evidence or want of evidence left a reasonable doubt as to his guilt. Applying the rule to the

case under consideration, it appears that the State introduced circumstantial evidence tending to show that the defendant shot the accused with a pistol and produced mortal wounds which caused his death. In addition to this the State also introduced evidence as to certain statements made by the defendant at the time of the homicide, to the effect that he shot and killed deceased with the pistol and shot him to save his own life. Such statements were direct evidence, and tended to establish the State's case on all the essential elements including malice. It is true that the statement that defendant shot and killed deceased with the pistol, when coupled with the further statement that it was done to save defendant's own life, would not have raised a presumption of law that the killing was done with malice (*Mann* v. *State,* 124 *Ga.* 760, 53 S. E. 324, 4 L. R. A. (N. S.) 934), but it would have been direct evidence from which the jury could have inferred malice. Such being the case, there was some direct evidence on all of the elements of the crime of murder; and consequently the State did not rely solely on circumstantial evidence to prove the case in its entirety, or any essential element thereof. The omission to charge the law of circumstantial evidence furnishes no cause for the grant of a new trial. The case differs from *Scroggs* v. *State,* 147 *Ga.* 737 (95 S. E. 226), and other similar cases, where the only proof relied on to connect the defendant with the crime was circumstantial evidence. Without proof to connect the accused with the crime the defendant could not ·have been convicted, and the State necessarily relied on such evidence to support a conviction.

2. One ground of the motion for new trial complains of the charge: "What the law means by malice aforethought is this: Malice is a state of mind, the intention to kill, under such circumstances as that the law would not justify nor in any way excuse the intention if the killing occur. It is the deliberate intention unlawfully to take the life of a human being under such circumstances as that the law would not justify nor excuse that intention if the killing occur." This charge was alleged to be error, because "it makes the existence of legal malice depend upon facts which would justify or excuse the intention, whereas there would be no legal malice in a homicide case, if under the circumstances there was mitigation which would reduce the homicide to man-

;slaughter. . . Mitigating circumstances attending the commission of a homicide may eliminate the element of malice and reduce an intentional, unlawful homicide to manslaughter." After delivering the portion of the charge quoted above the judge proceeded to elaborate, and in immediate connection therewith charged, among other things, " if you believe that the intent to kill existed at the time of the killing, and there was no circumstances of justification or mitigation present and shown, the law will presume legal malice to be present, and would denominate the act of killing murder." In the light of the further explanation, the foregoing excerpt from the charge, which was made the basis of this ground of motion for new trial, does not show. cause for reversal.

3. Complaint is made of certain excerpts from the charge as follows: (*a*) " When an unauthorized killing is shown, the law presumes that it was done with malice, unless the proof accompanying it shows that it was not done with malice." (*b*) ." If the proof shows an unlawful killing in the absence of all else, the law implies that it was done with malice aforethought." These portions of the charge are in accord with the decision of this court in *Mann* v. *State,* supra, where it was said: " In the trial of one indicted for murder, where the evidence adduced to establish the homicide presents two conflicting theories of fact, one based upon circumstances indicating malice and the other upon warranted inferences which negative its existence, then it becomes a question of fact, to be decided by the jury, as to which one of these inconsistent theories is in accord with the real truth of the occurrence. In such a case it is proper to charge the jury that the law presumes every homicide to be malicious, until the contrary appears from circumstances of alleviation, of excuse, or justification, and that it is incumbent on the prisoner to make out such circumstances to the satisfaction of the jury, unless they appear from the evidence produced against him."

4. One ground of the motion for new trial complains of the charge: " If the evidence shows the commission of the crime, and you are satisfied beyond a reasonable doubt that the defendant committed it with malice aforethought, either express or implied, and if the circumstances are consistent with his guilt, and inconsistent with any other reasonable hypothesis than that of his

guilt, then, though the evidence may not disclose a motive, you would be authorized to find the defendant guilty." This charge was alleged to be error, because the court referred to the offense as "the crime" and again denominated the offense as a crime by employment of the word "it," and thereby expressed an opinion that the homicide in question amounted to a crime. Whether the charge is subject to this criticism would depend upon a proper construction of the charge. The language employed by the court must be considered in connection with the context. The entire paragraph of which the charge excepted to is a part is as follows: "You will notice, gentlemen, that malice is a necessary ingredient of murder; and if it appears that the killing was done, and done without malice, it is not murder. There can be no murder without malice, and no malice without motive. You may inquire, therefore, whether or not there was any motive on the part of the defendant, to induce him to take the life of the deceased, and, if there was any motive, what that motive was; and if you find there was no motive on his part to commit the act, if you find he did commit it, you may consider that, especially if the evidence leaves the defendant's guilt at all doubtful, in deciding whether the defendant is guilty or not; yet, if the evidence shows the commission of the crime, and you are satisfied beyond a reasonable doubt that the defendant committed it with malice aforethought, either express or implied, and if the circumstances are consistent with his guilt, and inconsistent with any other reasonable hypothesis than that of his guilt, then, though the evidence may not disclose a motive, you would be authorized to find the defendant guilty." The language excepted to, construed in connection with its context, must have been understood by the jury to mean that "if the evidence shows the commission of the [homicide] with malice, and you are satisfied beyond a reasonable doubt that the defendant committed [the homicide] with malice aforethought, either express or implied, . . then, though the evidence may not disclose a motive, you would be authorized to find the defendant guilty." Under this interpretation the judge must have been understood by the jury, when he used the word "crime," as intending to use that word as meaning homicide, because in immediate connection with the word crime, he instructed the jury that they must be satisfied beyond a reasonable doubt that de-

fendant committed " it " with malice aforethought," which would have been out of place if the judge had used the word " crime " in its literal sense. Under this construction the language of the charge excepted to did not amount to an expression of opinion upon the facts of the case, in violation of the Penal Code, § 1058. The case differs in its facts from *Minor* v. *State, 58 Ga.* 551, and *Phillips* v. *State, 131 Ga.* 426 (62 S. E. 239), cited in the briefs of counsel for the plaintiff in error.

5. One ground of the motion for new trial complains of the charge : " In this case the defendant pleads that he did what he did in defense of his own life." This charge was alleged to be error, because it restricted the defendant to the single defense stated in the charge, whereas the defendant contended under his statement and the evidence that he would have been justified in killing the deceased to save his own life, while acting under the fears of a reasonable man or to prevent the infliction of a felony upon him. In *Powell* v. *State, 101 Ga.* 9 (29 S. E. 309, 65 Am. St. R. 277), it was said : " It is justifiable' homicide for one to kill another who manifestly intends or endeavors by violence or surprise to commit a felony upon him, and this is true whatever the grade of the felony may be. . . A charge which excludes one element of justification and makes justification rest entirely on another and distinctly different theory, although the latter be correct in the class of cases to which it applies, is restrictive of the right of the accused to have the law based on all the theories of the case given to the jury; and where such is the case, a new trial will be awarded." Under application of this principle of law, the charge excepted to, taken alone, would be erroneous; but in deciding whether or not it is subject to the criticism made upon it, other portions of the charge relating to the same matter must be taken into consideration. In immediate connection with the instruction above stated, the court further charged the substance of Penal Code §§ 70 and 71, relating to justifiable homicide and the doctrine of reasonable fears. When considered in connection with such other portions of the charge, the charge excepted to did not restrict the defendant to the single defense that the homicide was committed to save his own life.

6. In the seventh ground of the motion for new trial error is assigned on the following charge : " An abandoned and malignant

heart, in the sense of the law, is commonly held to be evinced or may be evinced by the unlawful use of a weapon likely to produce death, or the brutal and bloodthirsty use of the same." The criticism is that the charge impressed the jury that the brutal and bloodthirsty use of a weapon is evidence of an abandoned and malignant heart under any circumstances, whereas "it is only the brutal and bloodthirsty use of a weapon likely to produce death when the same is unlawfully used, or used without mitigation or justification, from which use malice may be deduced. In the course of the opinion in the case of *Ray* v. *State,* 15 *Ga.* 223, 244, it was said: " Our next question was, do we find in this evidence proof that the prisoner was influenced by an abandoned and malignant heart, in the sense in which the law uses these terms? This is commonly held to be evinced by a weapon, or other appliance likely to produce death, and by brutal and bloodthirsty use of such instrumentality." The language of the judge upon which error is assigned was probably taken from the discussion in *Ray's* case. While appropriately used in such a discussion by this court, it was not appropriate for the judge to employ such language while instructing the jury in this case. In view of the fact that a reversal will be had on other assignments of error, we do not hold that the instruction given would be ground for reversal for the reasons assigned.

7. In the 8th, 9th, 10th, 11th, 12th, and 13th grounds of the motion for new trial, error is assigned upon rulings of the court admitting in evidence the testimony of witnesses, stated in these grounds as follows: " Judge (meaning W. W. Wilson) and Chester (meaning this defendant) had gone up there, and the Judge had his knife drawn, and Mr. Sappington told him that he had better stop, and the Judge kept advancing on him with the knife, and Sappington had him covered with a pistol, and said, ' You had better stop,' and he made the remark two or three times and kept backing. . . Mr. Sappington had his pistol presented on the father of this defendant, telling him not to come on him with a knife. Immediately preceding that Chester had remarked, as best I remember, ' Mr. Sappington, did those fellows point me out as being the man that stole that car? ' He didn't say what fellows, didn't call their names, nor say where they were from. Sappington said, ' Yes, they said you was the

fellow,' or 'pointed you out as the fellow.' Chester remarked then, after a second or two as well as I remember, 'You and that damned bunch of thieves can't accuse me of stealing.' . . Chester remarked, 'I didn't call you a damn thief, I said you and that damned bunch of thieves,' and then Judge (Wilson) drew his knife, opened it, and advanced on Mr. Sappington. Mr. Sappington I noticed then had his pistol, and he had Judge Wilson covered with it, and said, 'Judge, you had better stop.' . . When I saw the pistol it was when Judge Wilson had his knife raised, and was advancing on Mr. Sappington, and Mr. Sappington says, 'Judge, you had better stop,' and he made that remark two or three times, and Judge Wilson kept advancing on him, and Mr. Sappington kept backing. . . When this happened Mr. Sappington was at the bank, right close to the door, on the inside of the bank, and when he was backing from Mr. Wilson, he was backing into the bank, further and further into the building. J. C. Wilson at that time was standing on the outside, on the sidewalk, just to the side of the door. J. C. Wilson was present all the time during the transaction that I have been talking about; he and his father walked up together, and J. C. Wilson spoke first. . . The first thing that J. C. Wilson said to Mr. Sappington was, that he asked him did those fellows accuse him of stealing the car, point him out as the man who stole the car, rather; and Mr. Sappington said, 'Yes, they pointed you out as the man who stole the car.' Chester said, 'That damned bunch of thieves can't accuse me of stealing a car.'" This evidence was admitted over the objections that it was irrelevant, and that the details of a previous difficulty between the deceased and accused were inadmissible.

In the 14th, 15th, 16th, and 23d grounds of the motion for new trial error was assigned upon rulings of the court admitting evidence as follows: "About two weeks before the killing I struck up with Mr. Wilson (meaning the defendant) in Cordele, and he asked me if I had heard that Della Pierce had Sappington's car, and he said he was at Seville with it, loaded with cotton. He said that this automobile case had given him a lot of trouble when it first came up, but that he had got his evidence in shape, where he felt all right about the car, he didn't feel like it would give him any trouble; but he said when the thing first happened he

couldn't have worried any more if he had killed a man, that he would rather be tried for murder than for stealing a car. . . Some time, a week or two before that, the defendant told me that he would rather be tried for murder than for stealing Mr. Sappington's automobile. . . I asked him (meaning the defendant) if he was going to settle it, and he said he would have to acknowledge to stealing the car if he did, and he said he would rather be accused of being a murderer than being a car thief. . . The first thing that attracted my attention was when I heard Mr. Wilson and Mr. Sappington out there talking. I saw Chester Wilson's father when he drew a knife and started towards Mr. Sappington. Mr. Sappington got back into the bank. I don't know what size knife it was. Just a good sized pocket-knife. I reckon you could kill a man with it. I didn't pay any particular attention to it. The knife was already open when I noticed it. I don't know whether Mr. Wilson drew back with the knife or not. I never heard him say anything about killing Mr. Sappington. I think I would have heard any conversation. When Mr. Sappington took a step backwards into the bank he went out of my sight, and Mr. Wilson disappeared from my sight into the bank. Mr. J. C. Wilson did not disappear from my sight into the bank. I believe I saw Mr. Johnson stop them, and heard him say something to them. I have forgotton the exact words he said. I think that he told Chester not to move, or said one at a time, or something like that, I forget the exact words."

The homicide occurred on August 23, 1920, and the previous difficulty, above referred to, took place on June 28 preceding. On the trial the defendant admitted the killing, and under these circumstances it was material to inquire what motive if any prompted the defendant in committing the homicide. While it is not competent generally to prove the details of previous difficulties between the parties, if the details of the previous difficulty tend to establish probable motive for the homicide they are relevant and are admissible. The evidence objected to tended to show motive for the killing, and the judge did not err in admitting it over the objections interposed to its introduction.

8. In the 17th, 18th, 19th, 20th, 21st and 22nd grounds of the amended motion for new trial, error is assigned upon the ruling of the court in excluding evidence which was offered by the

defendant, as follows: (*a*) Testimony of E. P. Wilson, "That he, the witness, notified his brother, J. C. Wilson, the defendant, some time before the shooting of the deceased, of the deceased's conduct, that the deceased was carrying a pistol; that he, the witness, warned the defendant that the deceased was carrying a pistol, and that he had seen the impression of it in the deceased's pocket." (*b*) Testimony of E. P. Wilson: "I told my brother (meaning the defendant) that Mr. Sappington was toting a pistol. I says, 'He has done drawed a pistol on you once, and he is carrying a pistol now.'" (*c*) Testimony of E. P. Wilson: "I told my brother (meaning defendant) that Mr. Sappington was toting a pistol, that I was frequently told about him having it, that he was carrying one in his pocket, and that I had seen the pistol on one occasion myself." (*d*) Testimony of E. P. Wilson: "Previous to the time of Mr. Sappington drawing a pistol on J. C. Wilson I had never known of him (Sappington) carrying a pistol, had never seen any indication or sign of his carrying a pistol; but every time I had seen him after that, I had seen what I presumed to be a pistol, and on one occasion I saw part of the pistol, and I communicated that to the defendant." (*f*) Testimony of F. G. Crenshaw, "That on Monday, August 16th, just one week prior to the homicide, he saw Mr. Sappington at a dipping-vat not far from Seville, and that he saw a bulk in his right front pocket that he took to be a pistol; that he had seen him on occasions, when closing the bank, put his pistol in his pocket in the interval between the altercation between him and the defendant of June 28th and the homicide; that he had never seen Mr. Sappington carry a pistol prior to that time; and that he warned the defendant that Mr. Sappington was carrying a pistol." (*g*) Testimony of S. O. Hill, "That between the time of the automobile incident of June 28th and the time of the killing, witness saw Mr. Sappington, the deceased, with a pistol, and advised the defendant of it at the time." After delivering this testimony the witness was cross-examined in the absence of the jury by the solicitor, on the subject, and testified, "I actually saw the pistol in his pocket, saw the handle of the pistol, saw that one time; and I told the defendant that I had seen him with one, and not to come in contact with him if he could help it, and he said he wouldn't."

All .of the foregoing evidence was objected to on the ground that it was irrelevant, and the court excluded it. The brief of counsel for the State, in referring to these grounds of the motion for new trial, says that they " complain of the ruling of the court excluding the evidence to the effect that the deceased habitually carried a pistol, and that this fact had been communicated to the defendant prior to the killing. This criticism is not well taken, for the reason that, if admissible at all, it is admissible upon the same theory that evidence of a violent and turbulent character of a deceased is admissible. This character of evidence is never admissible in a criminal case, unless it be shown that the deceased was the aggressor in the difficulty which resulted in his death. A perusal of the evidence in this case will show that there was not a line of testimony nor a word from which the inference could be drawn at the time this evidence was offered that the deceased was the aggressor at the time he was shot, but on the contrary all the evidence tended to show that he was possibly unlocking his mail-box at the time he was shot. The only thing in the evidence from which the jury could have inferred that the deceased was ever the aggressor came from the statement of the defendant, which statement was delivered after this testimony was offered and ruled out; and the record will show that the evidence was never re-offered after the statement of the defendant was made. See *Doyal* v. *State,* 70 *Ga.* 134; *Crawley* v. *State,* 137 *Ga.* 777 [74 'S. E. 537]."

The position of counsel for the State, as above indicated, seems to overlook certain parts of the testimony of witnesses for the State, as well as parts of the testimony of the witnesses for the defense, which were admitted as a part of the res gestæ without objection, as to declarations made by the accused at the time and place of the homicide, and are to be considered as direct evidence, as follows: P. P. Tyson, the second witness introduced by the State, in the first part of his testimony on direct examination stated that immediately after the shot was fired he ran to the scene of the homicide, and the defendant having his pistol in his hand said: " This thing saved my life; . . if he [I ?] hadn't got him he would have got him [me ?]." On cross-examination the witness stated that he heard E. P. Wilson, who had come to the scene, say to his brother (meaning the defendant), " What

have you done?" To which defendant replied, "If I hadn't got him he would have got me." In the last part of the cross-examination the same witness stated, that immediately after the shooting and while defendant was still in the lobby with the dead man and before anybody had spoken to him and while not addressed to any one, he heard the defendant say "if he [I?] hadn't got him he would have gotten him" [me?]. The Rev. Elder, another witness for the State, testified on direct examination that Parks Wilson (E. P. Wilson) immediately after the shooting came running up and, addressing defendant, said "My God, boy, what have you done?" and he said, "Well, I had to get him, or he would have gotten me." In the first part of the testimony of E. P. Wilson (Parks Wilson), who was the first witness introduced by the defense, he testified, that immediately after the shooting he rushed up to the door and looked in, and "I says to my brother Chester, 'Boy, what have you done?' and he says, 'Saved my own life, that is all,' and I says, 'What did you shoot that man for?' and he says, 'I shot him to keep him from shooting me,' and I says, 'Was he trying to shoot you?' and he says, 'Of course he was; don't you see his pistol there?' and I says, 'Well, come on out of there and go with me,' and he come on out of the building to where I was standing on the outside." S. O. Hill, the third witness for defendant, testified that he was a nephew of accused and heard the conversation between the accused and E. P. Wilson, above mentioned. His version of it was as follows: "Uncle Parks says, 'What in the world have you done?' and he says, 'Have saved my own life; that is all,' and uncle Parks says, 'Was he trying to shoot you?' and he says, 'Don't you see his gun lying there?' and uncle Parks says, 'Well, come on out of there,' and uncle Chester then was moving towards the door, and he stepped out on the ground." In the statement of the accused before the jury, after saying that he had gone to the post-office to get his mail and had taken his seat on the counter for the purpose of reading it, he stated as follows: "I had turned my back that way in order to get the light on a letter that I was reading. I was sitting there reading a letter. Mrs. Mashburn was sitting in a chair leaning back against a post on the sidewalk in front of the store-building when I came in, and she was in plain view of me then; she was sitting right in front of the door. I heard some-

body coming in at the door, and I looked, and just as I looked Sappington was leaving the letter-box, which was like this [indicating]; he poked some letters in the letter-box and stepped to his box; and when I seen it was him I got down off the counter, and when I got off the counter he looked at me, and he run his hand right down in his pocket like that [indicating], and said something, which was ‘Oh, yes, I told you so,’ or ‘All right, I told you so.’ The first part of it I didn’t understand; it was ‘Oh, yes,’ or ‘All right,’ or something of that kind, and I did understand ‘I told you so.’ Well, right then I saw what I was up against, and he was on me that quick, he rushed for me and me for him; he advanced I would say about one step, or possibly two steps; his pistol was in his pocket, and mine was like that, mine was in my hip-pocket. I had a hammerless thirty-eight Smith & Wesson; didn’t have any hammer on it; and I was going to him. I jerked my pistol as I ran at him just like this, and when I got to him his hand was in about that shape, [illustrating], and I grabbed that hand just like that [illustrating], with my thumb on the edge of his pants pocket just like that [illustrating], and just as I grabbed him I fired, and I suppose that he grabbed my pistol, he throwed up his hand and grabbed my pistol. About the second time I fired then he kind of gave way and fell back. I didn’t turn his hand aloose. I clung to that because that was my whole hope, I thought, to keep him from shooting me, was to hold to that hand. When he went to the floor I went down with him; we fell in a pile on the floor, and my hat fell off to one side. About the time we hit the floor he begun to wiggle his hand, try to get aloose, and he did pull his pants out from under my thumb, and I realized that he was about to get aloose from me there, and I throwed my hand over in this way [illustrating] and fired three more shots pretty rapidly, and he knocked my pistol off every time I fired. . . I didn’t know whether any of them took effect or not. I didn’t think they did, for he hit my hand or the pistol one every time I shot.”

The evidence that was rejected tends to show a custom upon the part of the deceased, commencing at the time of the previous difficulty, June 28th, to habitually carry a pistol, which fact was communicated to the defendant before commission of the homicide. Such evidence was relevant and material on the issue of whether

the defendant was impelled by the fears of a reasonable man that his life was in danger at the time of the homicide. For such purpose it stands on the same basis as the character of the deceased for violence. In the case of *Monroe* v. *State, 5 Ga.* 85, 137, it was said: "It is further argued that the court erred in rejecting evidence which went to show that the deceased was a violent, rash, and bloody-minded man, reckless of human life, in the habit of taking advantage of his adversaries in personal contests, and not willing to give them a fair and equal chance in fight, and that the prisoner was well acquainted with his character, in this particular. As a general rule, it is true that the slayer can derive no advantage from the character of the deceased for violence, provided the killing took place under circumstances that showed he did not believe himself in danger. Yet in cases of doubt, whether the homicide was perpetrated in malice, or from a principle of self-preservation, it is proper to admit any testimony calculated to illustrate to the jury the motive by which the prisoner was actuated. 3 S. & P. 308. And in this view, we think the evidence was improperly ruled out. Reasonable fear, under our code, repels the conclusion of malice; and has not the character of the deceased for violence much to do in determining the reasonableness or unreasonableness of the fear under which the defendant claims to have acted? Does it make no difference whether my adversary be a reckless and overbearing bully, having a heart lost to all social ties and order, and fatally bent on mischief; or is a man of Quaker-like mien and deportment? One who never strikes, except in self-defence, and then evincing the utmost reluctance to shed blood? We apprehend that the imminence of the danger, as well as the chances of escape, will depend greatly upon the temper and disposition of our foe. In these cases, every individual must act upon his own judgment, and in view of his solemn responsibility to the law." In the case of *Daniel* v. *State,* 103 *Ga.* 202 (29 S. E. 767), it was said: "The defense in a murder trial being that the accused shot and killed the deceased under the fears of a reasonable man that his own life was in danger, and there being evidence in behalf of the accused tending to show that, immediately before the homicide was committed, the deceased, upon provocation by words alone, placed his hand behind him and advanced upon the accused, it was erroneous to reject

evidence offered to show that the deceased habitually and notoriously carried a pistol, and that this was known to the accused. This is true whether upon the occasion of the homicide the deceased actually had upon his person a concealed pistol or not. Such evidence is in such a case admissible, however, solely for the purpose of determining whether or not the killing was really done under the influence of reasonable fears." Besides, the rejected evidence was admissible for the jury to consider and determine whether the carrying of a pistol by the deceased, under the circumstances, was or was not in the nature of an implied threat.

Applying these principles, the trial court erred in rejecting the evidence offered by the accused, and the error is such as to require a new trial.

9. In the 24th ground of the motion for new trial error is assigned upon the ruling of the court in admitting the testimony of Tyson, a witness sworn for the State, to the effect that a brother of the defendant, immediately after the shooting, was seen with a pistol in his hand a short distance from and walking towards the place of the homicide. This evidence was admitted over the objection that it was irrelevant and illustrated no issue in the case. There being no evidence tending to show the existence of a conspiracy between the brother and defendant, this evidence was irrelevant, and the court should have rejected it.

10. The ruling announced in the tenth headnote does not require elaboration. *Judgment reversed. All the Justices concur.*