## BRADY *v.* THE STATE.

1. Where, in a murder case depending entirely upon circumstantial evidence, the court gave in charge to the jury the principle of law laid down in the Penal Code (1910), § 1010, the failure of the court, in the absence of a timely, pertinent, written request, to instruct the jury, in connection with such principle, that the evidence must connect the accused with the perpetration of the alleged offense, is not reversible error.

2. Where in such a case the court instructed the jury that the defendant entered upon his trial with the presumption of innocence in his favor and that such presumption followed him throughout the entire trial until his guilt had been proved in the manner and form which the court would thereafter state to the jury, and where the court then gave in charge to the jury the principle of law embraced in the Penal Code (1910), § 1013, and where the court further instructed the jury that, if a reasonable doubt was raised by the evidence as a whole, the doubt must be given in favor of innocence, and further instructed the jury that the law does not permit one to be convicted on a violent suspicion of his guilt, the failure of the court to instruct the jury that, before they would be warranted in convicting the defendant, the evidence must be sufficient to establish his guilt to a moral and reasonable certainty and beyond a reasonable doubt is not reversible error in the absence of a timely written request for such instruction.

3. The instruction of the court set out in the third division of the opinion is not erroneous for any of the reasons assigned.

4. In the absence of a pertinent, timely, written request, the failure of the court to charge the jury on the subject of the impeachment of witnesses affords no ground for the grant of a new trial.

5. The verdict is supported by the evidence.

No. 4498. DECEMBER 15, 1924. REHEARING DENIED JANUARY 17, 1925.

Murder. Before Judge J. B. Jones. Dawson superior court. August 6, 1924.

John Brady was indicted for the murder of Colquitt Sewell in Dawson County on November 14, 1923. The evidence for the State and the defendant was substanially as follows:

Henry Covington, for the State, testified: He knows John Brady and Colquitt Sewell. On the second Saturday in April last they had a little disturbance, and Sewell cut Brady a little. He cut him on the side of the stomach and on the back of the hip. After the cutting Brady got the witness to take him to a doctor at Ball Ground. On the way to the doctor's Brady said: "I will kill Sewell. I will kill him before the sun rises in the morning." He kept on making this statement. The next morning witness went to Brady's house. Brady had a 38 pistol and tried to get his wife and mother to let him go and kill Sewell. He said he was going to kill him if he could get there. His wife and "them" asked him not to go, and persuaded him not to go. They told him it would cause trouble, and he told them he would not go then, and said he would go some time. (Cross examination) Brady's land adjoined Sewell's, and Brady lived about a quarter of a mile from Sewell. Brady made a crop on his farm, and Sewell made one on the place where he was living. Sewell got his mail right above Brady's house, about 250 yards and in plain view. Sewell stabbed Brady in three places, but the doctor said it was not any more than a pin-scratch. Brady came to witness to get him to go with him to the doctor at Ball Ground. He said they had had a fight that night at Brady's home. Witness brought him back that night. He was pretty mad and drunk. He was about sober the next morning.

S. H. Milsaps, for the State, testified: Colquitt Sewell was his son-in-law. He saw him on the 14th day of November. He died four days later at a hospital in Gainesville. He first learned of his being shot between six and seven o'clock. He was at home about a mile from the place of the shooting. Osc Brady and Oney

Godfrey came to his house and told him about it. He got a lantern, took his son, and went down with Osc Brady and Godfrey and found Sewell lying there. Sewell never spoke. He was just about dead. He was shot in the right eye and was lying on the side of the road where he had fallen. His shotgun was lying there unbreeched and the shell was lying about a foot or two from where it was unbreeched, and his hand was lying over it, "right where it was broke in two." They were about six feet from where he was lying. Between April and November Sewell worked at Whitestone, above Jasper, and went off to Tennessee and worked a while. He had not been back more than one and a half or two weeks. Osc Brady is a brother of John Brady. (Cross) Sewell made a crop that year, and was at home making his crop until it was laid by about the middle of July. After the crop had been laid by, he went off on the public works. Sewell was at home from April until the first of August. His land kind of cornered with Brady's. The field Brady was working was about 250 yards from the field where Sewell had a crop. Osc Brady and Godfrey said they were going down the field, that they had been to a certain place to work that day and just as the sawmill stopped they heard somebody hollering. It was about 300 yards, or a little more, from Osc Brady's house to where Sewell was. Osc Brady went and told his wife where he was, and then came back and helped witness with Sewell up to his home. After Osc Brady left witness, there were two men talking out there. Witness did not know who they were. (Redirect) When Osc Brady went off Godfrey stayed with witness. When Osc Brady went off, the men were walking in the direction where he went.

J. G. Milsaps, for the State, testified: He is a brother-in-law of Sewell. Was present at John Brady's house last year in April, at the time Brady and Sewell had a difficulty. "We were all standing around there drinking, when John said he was going to knock hell out of Sewell, and had something in his hand and hit him." It was dark, and witness did not know what he had—a rock or something. Brady knocked Sewell four or five feet and jumped upon him. Sewell told them to take him off. Witness jumped up and took Brady by the coat and pulled him up, and somebody ran up and hit witness. They said that Sewell cut Brady. He did not see the place where he was cut. Afterwards,

in September, he had a conversation with John Brady. They were working the road. Brady said that he was willing to make friends with witness, but "as to Sewell, he was going to whip hell out of him." Sewell was a small fellow, weighing about 135 pounds; and Brady 200 pounds. Witness did not make up with John Brady, and does not feel kindly towards him.

Martha Covington, for the State, testified: On more than two occasions before the killing she had a conversation with John Brady, relative to Sewell. In April, 1923, Brady said something about a knife—stabbing with a knife, and said he would not fight with a knife; if he did he would take a big knife and would souse it in that way, and if witness heard of Sewell being killed she might say it was John Brady who did it. About a week later, some time in April or May, she was passing John Brady's house and stopped, and he said that she might depend on it, that if she ever heard of Sewell being killed, she could say John Brady did it. (Cross) She is the mother of Rich, Henry, and Andy Covington. The first conversation was at John Brady's house. He was not drunk, but had been drinking. She did not know to whom she told of the above statement of the defendant, nor when, nor where. She first told it when she went home to the children. When asked which child, she replied: "I don't know—just all of them." Asked to whom she told it the second time, she replied she did not know. The witness's family and Brady's were on good terms. She never had anything against John Brady. The families had a little falling out, but got over it. Her son, Rich, was the one who reported John Brady's brother for stilling, and that gave rise to the trouble. They would pass and not look towards witness's house. There was a felling which extended even to witness. It all grew out of the fact that her son, Rich, reported Brady's brother for distilling brandy in August.

Hy Byers, for the State, testified: He and his brother ran a sawmill during 1923 in Dawson County. Col Sewell met his death in Dawson County on November 14, 1923. On that day Sewell was bearing lumber off at the sawmill. John Brady came to the mill and saw Sewell. He said: "I see that you are working that little bear, Col Sewell." Brady had his hand tied up. Witness noticed it, and asked him what was the matter. He said he had been in a pretty bad shape since Sewell cut him, and that this was

the first time he had seen Sewell since he had cut him, and that he had a good notion to go out there and "whip hell out of him." Witness told him he would rather he would not have any trouble at the mill, and Brady said he would not. Brady said he would see Sewell later. That was something like an hour and a half or two hours before Sewell was killed. The mill quit work about 5 o'clock, and Brady left about an hour and half before it quit. Saw Sewell when he left. Sewell got his dinner bucket and coat and walked off towards home. It was not over five minutes after Sewell left before witness heard a pistol fire in the same direction that Sewell had gone. He heard only one shot, and nothing afterwards. The place where Sewell was shot was about 150 yards from the mill.

Andy Covington, for the State, testified: He was working at Byers' mill the day Sewell was killed. Saw Sewell working there that day. Saw him start home. Sewell went one way and witness the other. Did not see Sewell after he left the mill. Saw John Brady at the mill that afternoon. After witness left the mill he heard a pistol when he had gone about 50 or 75 yards. Direction over north. It was not in the way Sewell had gone. It was over the way he went. Witness did not see Sewell afterwards, but knew where he was shot, and the pistol fired in that direction. After he heard the shot witness kept going towards his home. Saw a man running east in front of witness from where Sewell was lying. Witness could not swear who it was. When asked whom he took it to be, he replied: "I never took it." It was about dark, and witness did not know whom it looked like. Asked if he remembered the kind of clothes the man wore, he replied he did not. He was well acquainted with John Brady, had seen him that day, knew his general carriage; and when asked: "Who did you take it to be that afternoon that you saw?" he replied: "I can't tell." Asked: "Didn't you have any idea at that time?" he replied: "No, sir." He did not know who he thought it was at the commitment trial. Did not remember the man's face. Saw his body; his back was to witness. He was a tall fellow. Did not know how his size compared with that of John Brady. He was just a tall fellow, about Brady's height. Did not know about his being about Brady's size. Asked again how the man's size compared with Brady's, witness replied: "Well, about the size of him." Asked again: "Who did you think it was at that time?" he replied: "I never

thought." Witness testified he was 14 years old. Asked to whom he had been talking about this case, he replied: "Nobody." No one had said anything to him about what he was to swear. Asked again: "Who did you take it to be?" he answered: "I never took it to be no one. I just knew it was a man." Asked this question again, he replied: "I don't know. I never thought who it was at the time." Asked: "Who do you now think it was?" he answered: "I don't know." "Who have you thought it was since?" he replied: "I don't know." When again asked who he thought the man was, witness replied: "I ain't thought who it was." The man he saw running was about 50 yards from where Sewell was, and was going east towards Henry Holcomb's home in an opposite direction from John Brady's home. He first mentioned seeing this man running to his brother, Rich, the next morning. He did not tell his mother about it that night.—On being recalled, this witness testified that John Brady had on blue overalls that day at the sawmill, and that the man he saw running had on overalls of the same kind. They were blue overalls of the sort practically everybody in that country wore. Asked if he had not sworn before dinner that he could not tell what kind of clothes the man who was running wore, he replied: "I don't know about that—I might have done so." The man had on overalls. He did not swear that it was so dark he could not tell what sort of clothes he had on. Asked, if he swore it, was it the truth, he replied: "No, sir, it was just getting dark." He did not know what he swore in the morning. Asked if he did not swear that it was so dark he could not tell who the man was, he testified: "I might have done it." Since he had been on the stand he had been talking to no one but Mr. Vandiver and Mr. Fowler. He had told his brother, Rich, at dinner that the man had on overalls. He came to Mr. Vandiver and the solicitor-general just before dinner and told them he wanted to go back on the stand. He testified on cross-examination that he did not tell them so. Asked had he not just told Mr. McMillan (the solicitor-general) that he wanted to go back upon the stand, he replied: "Yes, sir."

The defendant made a statement in which he denied killing the deceased or knowing anything about it. He was at the sawmill of Hy Byers, and saw deceased working there. He told Byers it would be a good time to name to the deceased about the time he stabbed

defendant and see what deceased had to say about it. Byers said not, to say anything about it, as he had him working for him, and defendant replied he would not say anything about it. He saw a piece of cull on the ground, and knew Byers knew about deceased stabbing him, and said to Byers: "I feel like you ought to pick that thing up and frail him a little bit for the way he treated me." Byers told defendant he would rather not say anything about it then, and defendant could see him at quitting time. He stayed around there a while. He told him he was going on—that he hadn't been feeling well and thought he would go home and go to bed, because he had been on a fox hunt the night before. He went back home straight from the sawmill, went to bed about half an hour by the sun, and stayed there until about sundown; and his brother and Oney Godfrey came by, woke him up, and gave him a drink. They talked a while and went off. He denied making to Mrs. Covington the statements she attributed to him in her testimony.

Oney Godfrey, in rebuttal for the State, testified: He was with Osc Brady the day Sewell was shot. He did not see John Brady and did not go to John Brady's house at all that day. Does not remember seeing John Brady that day. Did not go to his house that night. He and Osc Brady found Sewell. They were at the former's house, heard the hollering, went out there and told Sewell's father-in-law about it. He was the first one told about it. The hollering was out there where they found Sewell, near a quarter of a mile from Osc Brady's house. He had been at Osc Brady's house something like twenty or thirty minutes when he heard the hollering. He and Osc Brady went out there when they heard the hollering. Heard the gun-shot—sounded like a pistol—something like 25 or 30 minutes before he heard the hollering. At the time he heard the shot he had not gotten to Osc Brady's house. (Cross) He and Osc Brady had been together all of the day Sewell was killed, working·over in the woods about a mile from John Brady's house. Asked if they were distilling, witness replied that he would not care to answer that. They did not come by John Brady's house when they left. Witness denied telling one Taylor that he went by John Brady's house. Had not old Marion Voyles so at the last term of Canton court. Did not tell Artis Voyles so either. Did not remember telling George Elkins so at his home, or telling

John Roper or Homer Gables so, or that John Brady was there in bed or about to go to bed. Did not tell Artis Voyles that if he ever made any different story it was because John Hill had given him some liquor and it was poison and he got drunk. (Redirect) Osc Brady told him he wanted him to swear that he was over at John Brady's that night and that John Brady was at home.

W. E. Shoemaker, for the State, testified: He is a first cousin of deceased. He went with them at the time they took deceased to Gainesville, and helped change his clothes. There was only one wound—in the corner of his right eye—looked like a pistol-ball hole.

B. R. Taylor, for the defendant, testified: He went to the jail the afternoon after the commitment trial of John Brady. Oney Godfrey was in jail. He had a conversation with Godfrey and Brady in reference to Godfrey's passing Brady's house. Godfrey said he stopped there and had a drink and that John Brady was there.

George Elkins, for defendant, testified: He had a conversation with Oney Godfrey at the witness's house, about what he knew of the killing of Sewell. John Roper was present. Godfrey told witness that when Godfrey and Osc Brady called by John Brady's house that evening it was right at night, and they stopped in, and John Brady was in bed and sat up and talked a few minutes, and they started over to Osc Brady's and before they got there they heard a gun fire, and they talked about it and said it was mighty late for anybody to be squirrel-hunting. They went on over to Osc Brady's, and, as he remembers, Godfrey said he went to the spring, and Osc was cutting wood, and Osc said he heard some hollering toward the sawmill, and they went over to the sawmill and couldn't find anybody, started back toward Brady's house, and heard somebody taking on, went out where it was, and it was Sewell.

John Roper, for the defendant, testified: The night before November 14th he was out hunting with John Brady and the brother of witness and others. He heard Oney Godfrey tell about where he was and what he did the evening Sewell was found. Godfrey said he came by John Brady's, that Brady was in bed, that they called him up and had some whisky, that they went over the hill and heard a gun fire. This conversation was at witness's house right

after the killing, nobody else being there except witness's children. No inducement was offered Godfrey to tell that story.

Artis Voyles, for defendant, testified: He had a conversation with Oney Godfrey about what the latter did the evening Sewell was found in a wounded condition. Godfrey said that he (Godfrey) and Osc Brady had worked at the still-house that day and had come by John Brady's house that evening, that John had his shoes off and was fixing to go to bed, that between John Brady's and Osc Brady's they heard a gun fire, and one of them said it sounded like a pistol. Godfrey went over to Osc Brady's, and something was said about no water being in the house, and Godfrey and one of Osc Brady's little boys started to the spring, and when they got out of the house they heard somebody hollering. They went back and told Osc Brady that may be somebody got a log on them, and they went up and found Col Sewell lying off the road, conscious. Osc Brady asked him, "What was the matter with you; was that you that shot?" Sewell said: "Yes, look around here and see if somebody ain't dead;" that they decided he had been knocked in the head. Nobody was with witness when Godfrey told him that.

Marion Voyles, for defendant, testified: He lives in Dawson County; is not related to John Brady. Knows Osc Brady and Oney Godfrey. Godfrey told him about his movements on the evening Sewell was found wounded, in Canton during court week. Witness said to Godfrey he heard he was out there, and Godfrey said yes. Godfrey said he knew nothing much, that he and Osc Brady were working at the sawmill, and when they quit that evening they went out by Frank Gable's, stopped a while, and then went on by John Brady's; that John Brady was on the bed; that they asked him to have a drink; that Brady said he didn't care for any, but took a drink out of the bottle; that they went on towards Osc Brady's, heard a gun-shot towards the sawmill; that when they came to Osc Brady's his wife told them to wash for supper; that there was not any water, and Godfrey and Osc Brady's little boy went to the spring to get water; that on the way they heard hollering, called Osc Brady, and Godfrey and Osc Brady went to the mill but didn't find anybody; that they started up a trail through the woods and ran into Col Sewell; that Sewell started talking to them when they were ten or fifteen steps away; that they walked up to him and asked him: "Is that you, Col; what is the matter?";

that Sewell said somebody knocked him in the head, and for them to look around, there was a dead man around there; that Osc Brady asked Sewell if it was Sewell that shot, and that Sewell said yes; that they looked around but didn't find anybody; and that Sewell said to tell his folks to do something for him.

Oscar Brady, for defendant, testified: He is a brother of the defendant. He and Oney Godfrey were making liquor the day Sewell was said to be shot. They were about three quarters of a mile from John Brady's. He and Godfrey started home and went by John Brady's and then on home. John Brady was lying on the bed; they talked to him, and Godfrey gave him a drink. On the way to home of witness he and Godfrey heard a gun-shot. This was about half way between the two places, which were a half-mile apart. It sounded like a gun or smokeless shell. When they got to home of witness something was said about water being brought. Godfrey said he would go with the kids. They went and came back, and Godfrey said for them to do their feeding, and witness said to go ahead and wash for supper. Godfrey went and washed, and came back and said he heard hollering. Witness went to door and heard it, and told Godfrey they better go see whether anybody was sawed up. They went to the sawmill, but didn't see anybody. They started back the way they had been skidding logs, and heard groaning, and went up and found Col Sewell. Witness asked Sewell what was the matter, and Sewell said somebody had knocked him in the head. Witness asked Sewell: "Was that you shot?" And Sewell said: "Yes; look around and see if you find anybody dead." Sewell said get somebody to do something for him. Witness and Godfrey went to Shed Milsaps' and told him, and Shed and one of his boys came back with witness and Godfrey. Witness did not ask Hy Byers to please not swear anything against John.

The defendant introduced in evidence the testimony of Henry Covington, delivered at the commitment trial, as follows: The next morning after Covington had taken John Brady to see a doctor, at the time Brady tried to get his wife to let him go and kill Sewell, Brady was suffering from his wound; he not only suffered that night but also the next morning and was drunk.

The defendant also introduced a part of the testimony of Hy Byers at the commitment trial, as follows: When John Brady

was talking to witness at the sawmill about it being the first time he had seen Sewell since Sewell had cut him, then John Brady said something about he had a good notion to pick up something and hit him with it.

Hy Byers, reintroduced by the State, testified: He had a conversation with Osc Brady the day of the commitment trial of John Brady, and Osc Brady said for witness not to swear anything against his brother, John Brady.

The jury returned a verdict of guilty, with a recommendation. The defendant moved for a new trial on the general grounds; and on the following special grounds: (4) Because the court erred in failing to instruct the jury that to authorize a verdict of guilty the evidence must have connected the movant with the perpetration of the murder alleged against him. (5) Because the court erred in failing to charge the jury that before they would be warranted in convicting the defendant the evidence must be sufficient to establish his guilt to a moral and reasonable certainty and beyond a reasonable doubt. (6) Because the court erred in charging the jury as follows: "Now the court will give you in charge the law as to implied malice, that is, that character of malice which the jury is allowed to imply;" the error assigned being that this instruction was misleading, in that the jury were authorized to receive it as an instruction to the effect that they were allowed to imply malice in this case; because said instruction amounted to an expression of an opinion as to the facts of the case by the court; and because it was not an abstract charge, but an express instruction that the jury trying the case were allowed to imply malice. (7) Because the court erred in failing to charge the jury that, if a witness swear wilfully and knowingly falsely, his testimony ought to be disregarded entirely unless corroborated by circumstances or other unimpeached evidence. The court overruled the motion for new trial, and error was assigned upon this judgment.

*B. R. Taylor, B. P. Gaillard Jr.,* and *Charters & Wheeler,* for plaintiff in error.

*George M. Napier,* attorney-general, *Robert McMillan,* solicitor-general, and *T. R. Gress,* asst. atty.-gen., contra.

HINES, J. (After stating the foregoing facts.)

1. The defendant complains that the trial judge erred "in failing to instruct the jury that, to authorize a verdict of guilty in said

case, the evidence must have connected movant with the perpetration of the offense of murder alleged against him." The judge instructed the jury that the case was dependent upon circumstantial evidence, and that to warrant a conviction upon such evidence the proved facts must not only be consistent with the hypothesis of guilt, but must exclude every other reasonable hypothesis save that of the guilt of the accused. The specific error alleged is, that the judge should have instructed the jury, in connection with the above instruction upon circumstantial evidence, that to authorize a verdict of guilty in this case, which rests solely upon circumstantial evidence, the proved facts must connect the defendant with the perpetration of the offense charged. Undoubtedly whether the evidence is entirely circumstantial or direct, it ought to connect the defendant with the criminal act. *Newman* v. *State,* 26 *Ga.* 633; *Green* v. *State,* 111 *Ga.* 139 (36 S. E. 609). While this is true, we do not think that the trial judge erred, in the absence of a timely written request for such instruction, in failing to charge the jury that the circumstantial evidence must connect the accused with the crime charged against him. Counsel for the defendant, in support of his contention that such failure is error, relies upon the case of *Hamilton* v. *State,* 96 *Ga.* 301 (22 S. E. 528), in which it was ruled that in a criminal case, when "the evidence against the accused was entirely circumstantial, it was the duty of the judge not only to charge upon the law of reasonable doubt, but also, whether so requested or not, to state to the jury the rule usually applicable in such cases, to the effect that the evidence must connect the accused with the perpetration of the alleged offense, and must not only be consistent with his guilt, but inconsistent with every other reasonable hypothesis." In *McElroy* v. *State,* 125 *Ga.* 37 (53 S. E. 759), and in *Wilson* v. *State,* 152 *Ga.* 337 (110 S. E. 8), this rule is stated in substantially the same language. But an examination of these cases will disclose that this court was dealing, not with the precise question raised here, but with the failure of the court to charge at all upon the question as to when the weight of circumstantial evidence was sufficient to authorize the jury to convict. The court in the *Hamilton* case did not give to the jury the principle of law laid down in the Penal Code, § 1010, as was done by the judge in this case. While we think that an instruction in the language set out in the *Hamilton, McElroy,* and *Wilson* cases

would be entirely correct and appropriate, we do not think that, when the judge charges the jury the principle of law announced in the above Code section, his failure, in the absence of a pertinent written request, to instruct the jury that the facts proved must connect the defendant with the offense against him requires the grant of a new trial.

2. The defendant insists that the court erred in failing to charge the jury "that before the jury would be warranted to convict the defendant, the evidence must be sufficient to establish his guilt to a moral and reasonable certainty and beyond a reasonable doubt." The judge instructed the jury that the defendant entered upon his trial with the presumption of innocence in his favor, and that "that presumption follows him throughout the entire trial, and at every stage of the trial, until his guilt has been proven in the manner and form that the court will hereafter give you in charge." The court then told the jury in what manner and form the guilt of the accused must be proved, by giving them this charge: "Whether dependent upon positive or circumstantial evidence, the true question in criminal cases is, not whether it be possible that the conclusion at which the testimony points may be false, but whether there is sufficient testimony to satisfy the mind and conscience beyond a reasonable doubt." The court further charged the jury "that in any event, any evidence whatever of alibi is to be considered by the jury on the general case with the rest of the testimony; and if a reasonable doubt is raised by the evidence as a whole, the doubt must be given in favor of innocence." He further instructed the jury that the law does not permit one to be convicted on suspicion, however violent the suspicion might be. In view of the fact that the court, in effect, instructed the jury that, before they would be warranted in convicting the defendant, the evidence must be sufficient to establish his guilt to a moral and reasonable certainty and beyond a reasonable doubt, the complaint that the court erred in failing to charge the jury as above set out is without merit: *McBeth* v. *State,* 122 *Ga.* 737 (50 S. E. 931). If the defendant desired further instruction on this subject, he should have presented a pertinent, timely request therefor.

3. The court charged the jury as follows: "Now the court will give you in charge the law as to implied malice, that is, that character of malice which the jury is allowed to imply." The

charge of the court upon the subject of implied malice is not set out in this ground of the motion for new trial complaining of this charge. The error assigned is that this charge was misleading in that it amounted to an instruction that the jury were allowed to imply malice in this case, and because it amounted to an expression of opinion by the court as to the facts of the case. The objections to this charge are without merit. The statement by the judge that he would give in charge to the jury the law as to implied malice, "that is, that character of malice which the jury is allowed to imply," did not amount to an instruction that the jury could infer malice without regard to the facts of the case, and certainly contains no expression of opinion upon the evidence.

4. The defendant asserts that the court erred in failing to charge the jury that "If a witness swear wilfully and knowingly falsely, his testimony ought to be disregarded entirely, unless corroborated by circumstances or other unimpeached evidence." In the absence of a pertinent, timely request, the failure of the court to charge on the subject of impeachment of witnesses affords no ground for granting a new trial. *Perdue* v. *State,* 135 *Ga.* 277 (6) (69 S. E. 184) ; *Benjamin* v. *State,* 150 *Ga.* 78 (102 S. E. 427).

5. It is earnestly insisted by able counsel for the defendant that the verdict is without evidence to support it. This question has troubled us. The case against the defendant is a weak one; but after a careful consideration of the facts and circumstances of the case, we do not feel justified in holding that the verdict is without evidence to support it. We will state succinctly the evidence upon which the State relies for conviction. The case is one entirely of circumstantial evidence. In April before the homicide in November, the deceased and the defendant had a difficulty in which the defendant was cut by the deceased. After the cutting the defendant got one Henry Covington to take him to a doctor. On the way, the defendant said to Covington that he would kill Sewell before the sun rose the next morning. The defendant on this journey repeatedly said he would kill the deceased. On the morning after the return from the doctor's, Covington visited the defendant's house. The defendant had a pistol, and tried to get his wife and mother to let him go and kill Sewell. He said that he was going to kill Sewell if he could get there. His wife and others persuaded him not to go, telling him that it would cause

trouble. He told them that he would not go then, but that he would go sometime. In April, 1923, the defendant had a conversation with Martha Covington, in which he referred to the fact that the deceased had stabbed him; and told this witness that, if she heard of the deceased being killed, she might say that it was John Brady that did it. About a week later she was passing defendant's house when the defendant repeated the above statement to her. In September before the homicide in November, Milsaps and the defendant were working the road. The defendant, referring to the fact that Milsaps had pulled the defendant off of the deceased in the difficulty in which the defendant was cut by the deceased, said to Milsaps that he was willing to make friends with him; but as to the deceased, he was going to "whip hell out of him." On the afternoon of the day of the homicide, the deceased was working at the sawmill of one Byers. As soon as he got there he said to Byers that he had been in pretty bad shape since the deceased cut him, and that he had a good notion to go out to where the deceased was working and "frail hell out of him." Byers told the defendant that he would rather he would not have any trouble at the mill. The defendant replied that he would not, but that he would see the deceased later. The defendant then left the mill; and in something like an hour and a half or two hours after the defendant left the deceased was killed.

Andy Covington, a boy fourteen years of age and a fellow servant of the deceased, left the mill when the employees quit work, and had gone about 50 or 75 yards, when he heard the pistol shot which dispatched the deceased, and saw a man running from the scene of the homicide. He testified that he did not know whom the fleeing man looked like, although he was well acquainted with the defendant, that he did not see the kind of clothes the man had on, that he did not see his face, but that he was about the defendant's height and size. On being recalled to the stand, this witness testified that the defendant had on blue overalls on the day of the homicide, that the man he saw running from the scene of the homicide had on overalls which looked like the same ones which the defendant had on at the mill, and that they were of the sort that practically everybody wore in that country. The defendant was a man weighing about 200 pounds.

Is the evidence sufficient to support the verdict? There was

bad blood on the part of the defendant towards the deceased. He entertained bitter and extremely hostile feelings towards the deceased from the time when he was cut by deceased in the preceding April. This hostility might have been due to the fact that the deceased had reported the defendant's brother for illicit distilling. Defendant made repeated threats. The last of these threats was made on the afternoon of the day of the homicide, and a short time before it took place. This last threat was made at the sawmill where the deceased was working. When requested by the proprietor of this mill not to have any difficulty with the deceased, the defendant said that he would see the deceased later. The employees at the mill quit work at 5 o'clock, and the deceased started for his home. It was not over five minutes before a pistol shot was heard in the direction in which deceased had gone and where he was found shot about 150 yards from the mill. The defendant made a statement in which he denied guilt, and introduced evidence to establish an alibi. The evidence discloses a strong motive for the commission of the homicide by the defendant. He had been stabbed by the deceased, and was possessed of a strong and abiding feeling of revenge. On the day of the difficulty in which he was cut by the deceased, and at different times, and down to the afternoon of the homicide, he made bitter threats against the deceased. These repeated threats indicated fixed and bitter bad feeling towards the deceased. When he made the last of these threats at the sawmill, and when requested by the proprietor of the mill not to attack the deceased while at work at the mill, he replied that he would see the deceased later. Shortly thereafter the employees at the mill, including the deceased, quit work. The deceased started toward his home. This was in the direction of the defendant's residence. In five minutes after the deceased started to go to his home, a pistol shot rang out in the direction in which he had gone. The deceased was found with a mortal wound inflicted by a pistol. A boy who was fifty yards from the scene of the killing saw a man about the height and size of the defendant running away. This man wore blue overalls like those worn by the defendant on the day of the homicide and shortly before the deceased met his death. This circumstance, though slight, in view of the fact that blue overalls were generally worn in this community, furnished some proof of the identity of the defendant with

the man seen fleeing from the scene of the crime. Much stronger facts, establishing this identity, are (1) that the defendant went to the place of work of the deceased an hour and a half or two hours before the homicide, told his employer that he had a good notion to "frail hell out" of the deceased, and, when told by the employer that the employer would rather he would not have any trouble at the place, replied that he would not, but would see the deceased later; (2) that at the expiration of the above time the deceased was killed; and (3) that the defendant was a large man, weighing 200 pounds, and that the man seen running away was of about the size and height of the defendant. Coupling these facts with the bitter hatred of the defendant to the deceased, and his repeated threats, which indicate a fixed and settled purpose on his part to take the life of the deceased in revenge for a past injury, we can not say that the verdict is without evidence to support it.

Under our system of jurisprudence, juries are our chosen agencies for the determination of issues of fact. If they go far afield and render verdicts without evidence to support them, this court will set them aside; but if there is evidence to support their verdicts, and their verdicts receive the approval of the trial judges, this court will not set them aside.

*Judgment affirmed. All the Justices concur, except Russell, C. J., dissenting.*

ON MOTION FOR REHEARING.

Hines, J. 1. In the defendant's motion for a rehearing it is urged that this court, in making the statement that the hostility of the defendant to the deceased "might have been due to the fact that the deceased had reported the defendant's brother for illicit distilling," erred because the evidence does not show that the deceased had reported the defendant's brother for illicit distilling. The writer inadvertently made this statement. This inadvertence does not affect in any way the soundness of the conclusion reached by this court in this case. It is the existence, and not the origin, of the fixed hostility of the defendant to the deceased which is of importance in this matter.

2. It is further insisted that the court overlooked the cases of *Bailey v. State,* 104 *Ga.* 530 (30 S. E. 817), *Williams v. State,* 113 *Ga.* 721 (39 S. E. 487), *Patton v. State,* 117 *Ga.* 230 (43 S. E.

533), *Young* v. *State,* 121 *Ga.* 334 (49 S. E. 256), and *Park* v. *State,* 123 *Ga.* 164 (51 S. E. 317). The writer did not overlook those cases in preparing the opinion of the court in this case. On the contrary, each one of them was read and considered. Those cases dealt with the question whether the evidence upon which the convictions therein rested was sufficient to authorize the verdicts of guilty therein. While helpful in passing upon the question in this case whether the verdict was without evidence to support it, it was not necessary to review the evidence in detail in those cases, in determining this question. In those cases this court held that there was not sufficient evidence. In this case, after careful consideration of the evidence, we reached the conclusion that there was some evidence to support the verdict, and that for this reason we were not authorized to usurp the place of the jury and declare the defendant not proved to be guilty.          *Rehearing denied.*