## 30223. JOHNSON v. THE STATE.

HALL, Justice.

Defendant Dr. Walter Henry Johnson appeals from a jury verdict finding him guilty of the murder of his wife. His main defense at trial was temporary insanity caused by withdrawal from the use of Ritalin, a drug taken by the doctor for treatment of narcolepsy. He enumerates

fourteen points as error. We, however, affirm.

Dr. Johnson had been licensed to practice medicine in Virginia, but had not practiced since 1970 when he had been disabled by the onset of narcolepsy, uncontrollable sleep, after an automobile accident. Thereafter, Dr. Johnson and his wife, a former nurse, had retired to a lakeside cabin on Lake Jackson in Newton County. In order to control his sleeping, he had been taking, with some success, the drug Ritalin in an injectable form, since the tablet form had undesirable side effects. There is evidence that he had tried other medications, but that none worked as desirably as the injectable Ritalin. Dr. Johnson visited and was prescribed for by a local doctor, who took little initiative in treating his patient, but left him to dictate his own treatment. In addition to the Ritalin, Dr. Johnson drank large amounts of wine and took Darvon, a common pain killer.

In February of 1974, the only drug company that made injectable Ritalin stopped producing it. As a result of its loss, Dr. Johnson was no longer able to function and became bed-ridden. He and his wife with the local doctor's knowledge, thus began to experiment with grinding up Ritalin tablets in a blender and administering the resulting suspension rectally by enema. This avoided the undesirable side effect of orally taking the tablets, but by the doctor's own testimony was uncertain as to dosage. However, by May of 1974, the doctor was using a suspension containing about half of the maximum recommended oral dosage and was able to get out of bed for periods of 30 to 40 minutes and talk with John Johnson, his son by a previous marriage who came to visit after an absence of over four years. During this visit, father and son embarked on long philosophical discussions before John left to go home to Tampa, Florida.

On Saturday of that week, June 8, 1974, John received an early morning phone call from his father who appeared nervous and agitated, and asked John to return to Lake Jackson so that he could tell John something which he could not say over the phone. Mrs. Johnson also encouraged him to come. John arrived in Atlanta after four that afternoon and called his father. They made arrangements for John to take a cab to the Covington Post

Office where Mrs. Johnson would pick him up by car. Though he did not speak to his stepmother over the phone, he could hear her talking in the background. He described his father as "very excited" and "tense," and "much more excited, elevated"; "he was either on (drugs) or very worried." He arrived at the designated spot at about 6:30 and waited until 10:00, when he again called his father who said his wife was dead but he did not know how it happened. At that time his father appeared "still excited, but a little more calm than the last time I had talked to him." John managed to get a ride home and found his stepmother dead from shotgun wounds and his father "in shock or near hysteria and incomprehensible."

The ambulance driver, two sheriffs and the county coroner all testified to the strange and confused behavior of the doctor and likened him to a person intoxicated or on drugs, although none of them suspected or tested for alcoholic intoxication. An inmate in the county jail who shared the cell with the doctor after his arrest also attested to the confused rambling and delusional character of the doctor's behavior and to the fact that the doctor appeared to be on drugs: He testified that the doctor claimed he was Jesus Christ and that he would get them all out of jail, and admitted killing his wife by shooting her with a shotgun. The doctor also tried to drown himself by putting his head down a commode.

In view of the doctor's state, he was sent by court order to Milledgeville where he was examined by Dr. Carl Smith on Monday, June 10, only two days after the shooting. He said that Dr. Johnson was suffering from toxic psychosis and was out of his mind, that he could not care for himself, and that he was confused, disoriented, hallucinating and his judgment was impaired. He stated that Dr. Johnson did not know right from wrong when he was admitted to the Binion Center at Milledgeville, and also testified that the cause of the toxic psychosis could have been either an overdose or withdrawal from Ritalin, or a combination of excessive use of Ritalin and excessive use of Darvon and alcohol.

Dr. Johnson testified that that week he told his wife he had decided not to use any more Ritalin and not to give him any more, but that he did not remember from that

point until he "woke up in the hole" at Milledgeville anything that happened concerning his wife, his time in jail, or whether or not he was given any more Ritalin doses by her.

1. Dr. Johnson enumerates as error the failure of the trial court to give the charges he requested on intoxication caused by the use of drugs. He wished to have the jury instructed that intoxication caused by drugs taken as directed under a doctor's prescription would be involuntary, that if the use of drugs destroys one's knowledge of right and wrong he cannot be held responsible for the crime, and that withdrawal of Ritalin as well as overdose may cause psychosis.

The relevant Code section dealing with intoxication is Code Ann. § 26-704. "A person shall not be found guilty of a crime when at the time of the act, omission, or negligence constituting the crime, such person, because of involuntary intoxication, did not have sufficient mental capacity to distinguish between right and wrong in relation to such act. Involuntary intoxication means intoxication caused (a) by consumption of a substance through excusable ignorance and (b) by the coercion, fraud, artifice, or contrivance of another person. Voluntary intoxication shall not be an excuse for any criminal act or omission." The state's theory of the case was that Dr. Johnson's condition was caused by *voluntary* intoxication due to his experimentation with the rectal suspension of Ritalin. The defense claimed the toxic psychosis caused by withdrawal of the Ritalin taken under a doctor's prescription was "excusable ignorance" under the statute and thus *involuntary.*

There are no cases in Georgia dealing directly with this point. However, the doctor urges in support of his contentions, the comments to the Code which offer the explanation that involuntary intoxication may be "due to excusable ignorance such as reliance on a physician's prescription or mistake as to the identity of a substance consumed." Committee Notes, Code Ann. Ch. 26-7, § 26-704 (p. 67). However, it was clear from his own statement that the doctor was not taking the drug Ritalin as directed by a doctor's prescription. It thus was not error to refuse to charge the jury as requested by the defendant

where the evidence did not support such a charge. *Ward v. State,* 199 Ga. 203 (33 SE2d 689).

Furthermore, the charge did include a verbatim reading of the Code section on intoxication, which afforded the jury an opportunity to find him not guilty if the withdrawal was caused by "excusable ignorance," which the jury was left free to define. Therefore, the refusal of the request in light of the entire charge and the evidence in the case was, if anything, beneficial to the defendant.

It also was not error to refuse to charge that where a drug destroys one's knowledge of right and wrong one cannot be held responsible for the crime. The trial court did charge that ". . . if because of alcohol, drugs or narcotics, one's mind becomes so emptied as to render him incapable of forming an intent to do the act charged or to understand that a certain consequence will likely result from it, he would not be criminally liable for his act." See Code Ann. § 26-601. "The court thus substantially covered the principles embodied in the requested charges and it was not error to refuse to give the requested instructions in the exact language requested." *Jackson v. State,* 225 Ga. 553, 561 (170 SE2d 281).

The requested charge on intoxication by withdrawal of Ritalin was a question of expert testimony to be determined as a fact question by the jury, not by the court as a matter of law. The court adequately charged the jury on expert testimony. It is not error to refuse to charge where the request is argumentative, summing up facts favorable to the defendant's theory of innocence. *Miles v. State,* 93 Ga. 117 (19 SE 805).

We therefore hold that the trial court properly and adequately instructed the jury on the issue of voluntary and involuntary intoxication.

2. Dr. Johnson also argues that the evidence presented by the defense had destroyed the presumption of sanity and that it was, therefore, error to charge the jury on that presumption. This contention is without merit for "the jury is free to reject the testimony of expert (and lay) witnesses as to the sanity of the accused and rely on the presumption of sanity." *Carter v. State,* 225 Ga. 310, 311 (168 SE2d 158). Accord, *Boyd v. State,* 207 Ga.

567 (63 SE2d 394).

Defendant's reliance on *Handspike v. State,* 203 Ga. 115 (45 SE2d 662) is misplaced. In that case a jury at a special hearing on insanity had previously found the defendant insane and incompetent to stand trial. Thus a presumption of continued insanity had arisen which the state had the burden of overcoming at the later trial. Code Ann. § 38-118. Here, on the other hand, there was no special plea and prior trial on the issue of insanity. Therefore, the jury was properly instructed that the doctor was presumed sane. *Carter v. State,* supra. See *Grace v. Hopper,* 234 Ga. 669 (217 SE2d 267).

Dr. Johnson also contends the evidence presented by the defense was sufficient to demand a finding of insanity as a matter of law. He thus cites as error the failure of the court to direct a verdict in his favor.

This contention is, however, without merit. Given the presumption of sanity and that the credibility of expert and lay witnesses is a fact question, the case was properly presented to the jury to decide. Code Ann. § 27-1802; *Ross v. State,* 217 Ga. 569 (124 SE2d 280); *McKenzey v. State,* 125 Ga. App. 508 (188 SE2d 116).

Dr. Johnson further argues that the charge on the presumption of sanity was erroneous in stating that "the law presumes all persons to be of sound mind *and memory.*" (Emphasis supplied.) This contention is without merit inasmuch as the charge as given was requested by the defendant. He may not now claim that the court erred in honoring his request. *Patterson v. State,* 233 Ga. 724 (213 SE2d 612).

3. Dr. Johnson's fourth enumeration of error alleges that the trial court erred in failing to instruct the jury on the law of circumstantial evidence. Though the court gave the definition, it did not charge Code Ann. § 38-109 that the circumstantial evidence must be sufficient to exclude "every other reasonable hypothesis save that of the guilt of the accused." Furthermore, the court refused to give a requested charge of the defendant relating the circumstantial evidence rule to the main issue in the case, the mental state of the accused.

It is well settled that where the state relies solely on circumstantial evidence, it is reversible error to fail to

charge Code Ann. § 38-109. *Cofer v. State,* 178 Ga. 742 (174 SE 331); *Weaver v. State,* 135 Ga. 317 (69 SE 488); *Hart v. State,* 14 Ga. App. 714 (82 SE 164). However, where there is some direct evidence, it is not error to fail to charge on circumstantial evidence. *DePalma v. State,* 228 Ga. 272 (185 SE2d 53); *Walker v. State,* 226 Ga. 292 (174 SE2d 440).

The state argues that the defendant's statement that he killed his wife amounted to a confession and constituted direct evidence of his guilt. In doing so, the state relies on *Pressley v. State,* 201 Ga. 267, 271 (39 SE2d 478). "Where there is evidence showing that the defendant admitted the homicide of which he is accused, and he states in connection therewith no facts or circumstances of excuse or justification . . . the statement amounts to a confession." Accord, *Patrick v. State,* 209 Ga. 645 (74 SE2d 848); *Owens v. State,* 120 Ga. 296 (48 SE 21); *Harvey v. State,* 111 Ga. App. 279 (141 SE2d 604). In such a situation, the law presumes malice, the requisite mental state to be guilty of murder. *Patrick v. State,* supra.

Where the defendant raises the defense of insanity the question of intent is merely put into issue, and the defendant must produce enough evidence only to raise a reasonable doubt of malice. *Grace v. Hopper,* 234 Ga. 669, supra. The presumption, however, remains in the case for the jury to consider along with the evidence presented by the defendant in rebuttal. *Fields v. State,* 221 Ga. 307 (144 SE2d 339); *Boyd v. State,* supra. See *Templeton v. Kennesaw Life &c. Ins. Co.,* 216 Ga. 770 (119 SE2d 549). The statement of guilt, therefore, was direct evidence against the defendant, and the charge on circumstantial evidence was not required. *Wilson v. State,* 152 Ga. 337 (110 SE 8).

The appellant's further argument respecting a request to charge on this subject is without merit for the reasons stated above. In any event, we find no harmful error.

4. Defendant also asserts that the court erred in failing to instruct the jury as to the law of accident. This enumeration is without merit as there was no evidence to warrant such a charge. *Fields v. State,* supra; *Freeman v. State,* 190 Ga. 335 (9 SE2d 236).

5. In addition, Dr. Johnson complains that the charge to the jury was inadequate on the issue of malice. The trial court clearly and adequately charged the jury on the question of malice and also extensively charged on insanity. The jury was thus amply instructed on the issues involved in deciding whether the doctor had the requisite mental state to have been guilty of murder.

6. The defendant's third enumeration cites as error the trial court's allowing the alternate juror to retire with the jury to deliberate. Dr. Johnson relies on Code Ann. § 59-904 which provides: "Upon final submission of the case to the jury said alternate jurors shall not retire with the jury of 12 for deliberation and the court may discharge the alternate jurors, but if the court deems it advisable it may direct that one or more of the alternate jurors be kept in custody of the sheriff or one or more court officers, separate and apart from the regular jurors, until the jury have [sic] agreed upon a verdict."

The defendant cites as support for his contention the case of *Glenn v. State,* 217 Ga. 553 (123 SE2d 896). In that case, however, the jury was charged that the role of the alternate juror was to remain with the jury during its deliberations but to take no part as long as the twelve original jurors remained. This charge was contrary to Georgia Code § 59-904 quoted above and was thus clearly erroneous. Furthermore, the state in *Glenn* came forward with no evidence to rebut the presumption of harm to the defendant. *Suple v. State,* 133 Ga. 601 (66 SE 919). This is not true of the case now before this court, and we thus distinguish it.

It is clear from the evidence presented to the trial court that the alternate juror, Joe Key, went into the jury room where he remained while the jury selected a foreman, looked over the physical exhibits, and reviewed the evidence, and that when the court realized that the alternate juror entered the jury room with the jury, the bailiff was asked to remove him. However, the evidence is in conflict as to whether the alternate left the room before or after the sole vote on the verdict was taken.

The alternate juror, when he entered the jury room at the time the jury began to deliberate, became, like any third party, a stranger to the jury. United States v.

Beasley, 464 F2d 468 (10th Cir. 1972). Whenever such jury misconduct is shown, a presumption of injury to the defendant is raised, which the state must overcome by a showing of harmlessness. *Suple v. State,* supra; *Smith v. State,* 122 Ga. 154 (50 SE 62); *Shaw v. State,* 83 Ga. 92 (9 SE 768); *Wellmaker v. State,* 124 Ga. App. 37 (183 SE2d 62); *Spooner v. State,* 56 Ga. App. 618 (193 SE 482).

The standard is most clearly set out in United States v. Allison, 481 F2d 468, 472 (5th Cir. 1973). "Sufficient prejudice and effect on the jury's verdict would be shown and, therefore, a new trial required if the alternate . . . in any way participated in the jury deliberations, or if any regular juror was deterred in the free exercise of his independence of thought, expression, or action by the mere presence of a non-participating alternate during deliberations." All twelve jurors swore in their affidavits that they had not been influenced in any way by the presence of the alternate juror.

The evidence as to any participation by the alternate juror is in conflict, however. The defense attorneys said in their affidavit that the bailiff brought out the alternate juror after the jury had indicated it had reached its verdict, but before the jury reentered the courtroom. The alternate juror himself swore that he did not say anything while the deliberations were going on, though he had looked at some of the physical evidence, and that he had been called from the jury room before the vote was taken.

Most of the jurors also said in their affidavits that the alternate had left before they voted; others thought he remained and went into the courtroom with the jury. Of these however, none could say positively that the alternate juror had voted, but some were unsure as to whether he voted or not. In addition, the defense offered affidavits of two of the jurors who also had given affidavits to the state which swear facts similar to that presented by the defense attorneys as to the timing, but which are equivocal as to whether or not he actually participated, saying "that the jury deliberated on the innocence or guilt of Walter Henry Johnson, Sr., with twelve jurors plus Joe Key being in deliberation thereon. . . ."

The affidavits of the jurors, however, must be read so as not to impeach their verdict. *Williams v. State,* 206 Ga.

757 (58 SE2d 840); *Hill v. State,* 91 Ga. 153 (16 SE 976); *Spooner v. State,* 56 Ga. App. 618, supra.

By favorably reading the jurors' affidavits along with that of the alternate juror himself who swears he was called from the room before the vote was taken, the state has made a sufficient showing of harmlessness to overcome the presumption of prejudice to the jury. See, United States v. Allison, supra, and at 487 F2d 339 (5th Cir. 1973). The mere fact that the alternate juror admits that he looked at some of the evidence is insufficient to rise to the level of participation which caused a reversal in United States v. Beasley, supra. There, the alternate juror participated in the election of the foreman and voted with the jury on when to go to lunch. Where the trial court receives evidence that is conflicting as to irregularities in the conduct of the jury, the appellate court will not reverse unless the trial court has abused its discretion. *Bennett v. State,* 86 Ga. App. 39 (70 SE2d 882). This it clearly has not done.

7. Dr. Johnson also contends that because of the irregularities involving the jury, the court erred in not declaring a mistrial on its own motion. One of the irregularities claimed, that of the alternate juror, has been fully treated in Division 6 of this opinion, where we held that no prejudicial error occurred.

The other alleged irregularity occurred at the motel room where the jury was sequestered. When it was reported that a phone call had been placed from one of the rooms occupied by the jurors which was clearly against the instructions of the court, the trial judge held a hearing on the matter. The alternate juror and the juror involved were then questioned on the stand under oath and denied having made any calls. It appeared several days later, though she had denied it at first, that the motel maid had actually placed the call.

The incident had occurred before the jury began deliberations and defense counsel agreed to "waive any defect that might be technical concerning that call except and unless . . ." the juror had discussed the merits of the case, and also agreed to accept the sworn testimony of the jury regarding the phone call. Under these conditions, and with the testimony of the jurors that they had not

made the calls, the trial court did not abuse its discretion in declining to grant the mistrial. *Bennett v. State,* 86 Ga. App. 39, supra. In light of the later finding that it was the maid who had used the phone, the defendant could not have been harmed in any way.

The trial court did not err in failing to grant a new trial and the evidence is sufficient to support the verdict. There being no error in the proceedings in the trial court, the judgment must be affirmed.

*Judgment affirmed. All the Justices concur, except Gunter and Ingram, JJ., who dissent.*

SUBMITTED AUGUST 15, 1975 — DECIDED OCTOBER 21, 1975 — REHEARING DENIED NOVEMBER 4, 1975.

*Grace W. Thomas,* for appellant.

*John J. Strauss, District Attorney, Arthur K. Bolton, Attorney General, G. Stephen Parker, Assistant Attorney General,* for appellee.