310 Ga. 81
FINAL COPY

S20A0827.  LESTER v. THE STATE.

WARREN, Justice.

Layton K. Lester was convicted of malice murder and other
crimes in connection with the shooting death of Lorrine Bozeman.[1]
On appeal, Lester contends that the trial court erred in admitting
statements he made to law enforcement after Bozeman's death and
in denying his "motion for mistrial"[2] arising from the presence of an

[1] The crimes were committed on April 29, 2007.  On May 12, 2009, a Tift
County grand jury indicted Lester, along with Shurrod K. Rich, for malice
murder, two counts of felony murder, armed robbery, burglary, and possession
of a firearm during the commission of a crime.  Lester was tried separately
before a jury from August 13 to 14, 2009.  The jury found Lester guilty on all
counts, and on December 15, 2009, nunc pro tunc to December 10, 2009, the
trial court sentenced him to life in prison for malice murder, a concurrent term
of twenty years for armed robbery, and terms of twenty years for burglary to
run consecutively to the murder sentence and five years for the firearm count
to run consecutively to the burglary sentence.  The felony murder counts were
vacated by operation of law.  Lester filed a timely motion for new trial on
December 18, 2009, which was amended more than nine years later on
February 22, 2019.  The trial court denied the amended motion for new trial
on June 5, 2019, and also modified the original sentences for burglary and the
firearm count so as to run concurrently with the sentence for murder.  Lester
filed a timely notice of appeal on June 10, 2019, which was amended on July
17, 2019.  The case was docketed in this Court to the April 2020 term and
submitted for a decision on the briefs.

[2] We discuss Lester's purported motion for mistrial below in Division 3.

alternate juror during jury deliberations. Seeing no reversible error, we affirm.

1. Viewed in the light most favorable to the jury's verdicts, the evidence presented at Lester's trial showed that Bozeman, who lived in a house with her mother and who was Lester's great aunt, received a large amount of cash that she was planning to use to buy a piece of property. On the evening of April 29, 2007, Lester was at co-indictee Shurrod K. Rich's house. Rich's brother was present and heard Lester suggest to Rich that they "go rob" Bozeman, telling Rich that they could get $5,000 from the robbery. Shortly afterwards, Rich and Lester left Rich's house.

Between 10:00 and 10:30 on the same evening, Bozeman's front door was kicked in, and she was shot twice. Bozeman's sister, Vernel Clay, who lived several houses away, heard the gunshots and saw two people running through her backyard afterwards. Clay's son also saw the same two people running up the street with two shotguns that belonged to Bozeman's mother. Clay and her son ran to Bozeman's house and found her lying on the floor without a pulse.

2

A paramedic arrived and confirmed that Bozeman could not be revived, and the crime scene was processed. Photographs taken at that time and trial testimony from the paramedic and a law enforcement officer revealed that Bozeman's left pants pocket was pulled inside out before they arrived.

When Rich and Lester returned to Rich's house, Rich's brother observed that Lester had changed into black clothes, was breathing hard, was nervous, and later had cash to spend for food. Rich and Lester told Sean Ross, a friend of theirs who lived in the area, that they had robbed and shot Bozeman and that she had screamed. Later the same night, when Lester's mother came to pick him up, Lester took $1,000 cash out of his pocket and asked a friend, Rodney King, to hold it for him. After Lester's mother overheard Lester talking on the phone and noticed that he was acting nervous and scared, she grew concerned and approached law enforcement. As a result, Lester and his mother went to the police station, where two GBI agents and a detective interviewed Lester over the course of several hours, starting at approximately 7:00 that morning.

When Lester arrived at the police station, he was carrying $476 in cash. He told the officers that he was 15 years old, had completed the ninth grade, and was not under the influence of drugs or alcohol. Lester's mother was present for the beginning of his first interview, and she was present when he waived his rights under *Miranda*.[3] Although the interview lasted for a total of about six hours, Lester was given several breaks, and the officers reviewed Lester's rights each time they resumed interviewing him.

During the portion of the interview when his mother was present, Lester told the officers that King and another person had planned to rob a drug dealer, left Rich's house to commit the robbery, and returned and gave Lester cash to keep him quiet. During the interview, Lester admitted that he knew Bozeman generally kept money in her pocket because of a previous burglary.

Almost an hour and a half into the interview, an officer asked

---

[3] See *Miranda v. Arizona,* 384 U.S. 436 (86 SCt 1602, 16 LE2d 694) (1966).

if Lester's mother would leave the room, and she agreed.[4]  Officers continued interviewing Lester, who changed his story several times. At one point, officers brought King into the interview room because King had given a statement that contradicted Lester's.  During that time, there was no physical contact between Lester and King, and officers were positioned so that they could prevent any type of threat to Lester.  Lester then admitted that King was not involved in Bozeman's robbery and murder.  When King left, Lester said that Gerald Rogers and another person approached him about committing a robbery, left Rich's house, returned, and gave Lester $1,600 not to tell the police anything.  Officers interviewed Rogers,

---

[4] A DVD recording showed that, about an hour into the interview, one GBI agent asked Lester if he wanted to talk to the officers without his mother. Lester's mother asked him if he wanted her to leave, and he said, "if you want to leave."  Lester's mother responded that "the way you're going, I might need to."  More than once, she told Lester to tell the truth, and she eventually became more involved in the interrogation, at one point telling him that he was "leaving out stuff" and asking him if he had told the others that his aunt had money.  After describing one remark of Lester's as a "strange statement," one GBI agent asked Lester, "Is it because your mom's here?  Would you tell us the whole truth if your mom wasn't here?"  A few minutes later, the agent asked Lester's mother if she would "mind if we talk with him a little right quick?" She agreed, got up, and stepped outside the room, but she continued listening to the interview from another room for at least an additional 25 minutes.  At some later point, Lester's mother said she was going home to get some sleep.

who gave a statement that contradicted Lester's, and when Rogers was brought into the interview room with Lester, Lester did not want to speak in front of Rogers. When Rogers was taken out of the room, Lester admitted that he and someone other than Rogers had planned Bozeman's robbery.

At Lester's request, he then spoke alone with one of the GBI agents who had previously interviewed him. Lester told the agent that the person he had planned the robbery with was named "Grady," but that his real name was Shurrod Rich. Lester admitted that he and Rich had gone to Bozeman's house on the night of the robbery and that Lester kicked in Bozeman's door, but claimed that Rich shot Bozeman twice. Lester also said that Rich took the money from Bozeman's pocket and indicated that the money had been taken specifically from Bozeman's left pocket.

At some point during the course of his interviews, Lester was arrested for murder. Before trial, Lester moved to suppress all of the statements he made to law enforcement during the interviews

summarized above. After a pretrial *Jackson-Denno*[5] hearing on the admissibility of those statements, the trial court found by a preponderance of the evidence that Lester was "advised of his *Miranda* rights, understood his *Miranda* rights, voluntarily waived them[,] and thereafter freely and voluntarily gave these statements" and that the statements were "made without any offer of hope or fear of injury." The trial court also determined that it would "allow the jury to view" video recordings of portions of Lester's interview.

Lester does not contest the legal sufficiency of the evidence supporting his convictions. Nevertheless, consistent with this Court's general practice in murder cases, we have reviewed the record and conclude that, when viewed in the light most favorable to the verdicts, the evidence presented at trial was sufficient to authorize a rational jury to find Lester guilty beyond a reasonable doubt of the crimes for which he was convicted.[6] See *Jackson v.*

[5] *Jackson v. Denno*, 378 U.S. 368 (84 SCt 1774, 12 LE2d 908) (1964).
[6] We remind litigants that the Court will end its practice of considering sufficiency sua sponte in non-death penalty cases with cases docketed to the term of court that begins in December 2020. See *Davenport v. State*, 309 Ga.

7

*Virginia*, 443 U.S. 307, 318-319 (99 SCt 2781, 61 LE2d 560) (1979).

2. Lester contends that the trial court failed to apply the nine-factor test laid out in *Riley v. State*, 237 Ga. 124, 128 (226 SE2d 922) (1976), to evaluate whether his rights under *Miranda* were knowingly and voluntarily waived. He also argues that the trial court "failed to apply the proper procedural safeguards for juveniles" at the pre-trial *Jackson-Denno* hearing when determining that Lester's statements were knowing and voluntary and thus admissible.[7] Because Lester has failed to show that the trial court

385, 399 (846 SE2d 83) (2020). The Court began assigning cases to the December Term on August 3, 2020.

[7] The majority of Lester's arguments focus generally on whether his custodial statements were made voluntarily or whether the State violated his due process rights by attempting to coerce his statements. But he also argues about whether he voluntarily waived his rights under *Miranda*. In so doing, he largely conflates the *Riley* test — which was initially decided in the context of whether a juvenile defendant had knowingly and intelligently waived his rights under *Miranda*, see 237 Ga. at 127-128 — with a more general totality-of-the-circumstances due process analysis. See *Byrum v. State*, 282 Ga. 608, 611 n.2 (652 SE2d 557) (2007) ("Although appellant contends that the admissibility of his statements should be analyzed using the factors set forth in *Riley* . . . , the issue in that case was whether there was a knowing and intelligent waiver of constitutional rights by the defendant. Here, appellant made voluntary inculpatory statements prior to the point at which *Miranda* warnings were constitutionally required, and the question of whether he knowingly and intelligently waived his rights is not implicated.") (citation omitted). Notably, however, even though *Riley* was decided in a more limited

did not properly apply the law concerning a juvenile's waiver of his rights or due process voluntariness, his claims fail.

In the specific context of evaluating whether a juvenile defendant's rights were knowingly and voluntarily waived, the inquiry "depends on the totality of the circumstances and the state has a heavy burden in showing that the juvenile did understand and waive his rights." *Riley*, 237 Ga. at 128. To that end, "age alone is not determinative of whether a person can waive his rights. Instead, the question of waiver must be analyzed by a consideration of several factors":

> (1) age of the accused; (2) education of the accused; (3) knowledge of the accused as to both the substance of the charge and the nature of his rights to consult with an attorney and remain silent; (4) whether the accused is held incommunicado or allowed to consult with relatives, friends or an attorney; (5) whether the accused was interrogated before or after formal charges had been filed; (6) methods used in interrogations; (7) length of interrogations; (8) whether vel non the accused refused to voluntarily give statements on prior occasions; and (9) whether the accused has repudiated an extra judicial

context, this Court has also relied on its factors in evaluating more general due process voluntariness cases for juveniles. See, e.g., *Oubre v. Woldemichael*, 301 Ga. 299, 305 (800 SE2d 518) (2017); *Murray v. State*, 276 Ga. 396, 397-398 (578 SE2d 853) (2003); *Jackson v. State*, 272 Ga. 191, 195 (528 SE2d 232) (2000).

statement at a later date.

Id. (citation and punctuation omitted). See also *Allen v. State*, 283 Ga. 304, 305 (658 SE2d 580) (2008).

In addition, in making its pretrial decision about the admissibility of Lester's statements, the trial court was required to "determine whether, based upon the totality of the circumstances, a preponderance of the evidence demonstrate[d] that the statement was made freely and voluntarily." *Butler v. State*, 292 Ga. 400, 403 (738 SE2d 74) (2013) (citation and punctuation omitted). We have also held that when the voluntariness of a statement to law enforcement is at issue, a trial court should make an "actual ruling" on the voluntariness of the statement. *Parker v. State*, 255 Ga. 167, 168 (336 SE2d 242) (1985) (where trial court made no specific ruling on the voluntariness of a confession, case remanded for clarification and further findings as needed). But we generally do not require trial courts to make specific, on-the-record findings about each aspect of the totality of the circumstances they evaluate or to make "explicit factual findings or credibility determinations on the

record." *Cain v. State*, 306 Ga. 434, 438 (831 SE2d 788) (2019) (affirming trial court's denial of a motion to suppress defendant's custodial statement where the trial court found that, based on a preponderance of the evidence, the statement was made voluntarily, because the trial court had made an "implicit finding as to the voluntariness of [the] statement" that was not clearly erroneous based on the record). See also *Allen v. State*, 262 Ga. 649, 649-650 (424 SE2d 1) (1993) (rejecting argument that "the trial court erred by not making a finding on the record that there was a factual basis for its determination" that defendant's "incriminating custodial statement had been freely and voluntarily given" because such a finding "is not required by either state or federal law" and affirming trial court where the record showed that the trial court's determination was not clearly erroneous). Indeed, "unless clearly erroneous, a trial court's credibility determinations and factual findings relating to the admissibility of a confession," whether explicit or implicit, "must be upheld on appeal," although "we independently apply the law to the facts." *Davis v. State*, 307 Ga.

11

625, 629 (837 SE2d 817) (2020) (citation and punctuation omitted).

Lester first argues that the trial court failed to "specifically apply" the nine factors set forth in *Riley*. But where the record evidence is "sufficient to support the court's conclusion that [a defendant] knowingly and voluntarily waived his right to counsel and that his statements were properly admitted at trial under the *Riley* test," we have rejected the assertion that "the appellate record is incomplete" simply because the trial court's order is "silent as to whether the *Riley* factors were considered." *Green v. State*, 282 Ga. 672, 674 (653 SE2d 23) (2007).

To that end, the record shows that both Lester and the State argued the *Riley* factors at the *Jackson-Denno* hearing, with Lester focusing on how certain *Riley* factors supported his position and the State presenting evidence about all nine *Riley* factors.[8] The trial court concluded that Lester voluntarily waived his rights,

---

[8] The State also presented evidence on all nine *Riley* factors at trial, and this "Court may consider all the evidence of record, in addition to the evidence adduced at the *Jackson-Denno* hearing, in determining the admissibility of a defendant's statement." *Francis v. State*, 296 Ga. 190, 194-195 (766 SE2d 52) (2014).

12

specifically concluding that Lester — who the trial court acknowledged was a "minor" — was "advised of his *Miranda* rights, understood his *Miranda* rights, and voluntarily waived them." The trial court was not required to go further and make express findings on the record specifically about the *Riley* factors. See *Green*, 282 Ga. at 674.

Second, Lester argues that law enforcement officers "used inappropriate interrogation techniques" and implies that officers coerced Lester's statements by bringing into the interview room people (specifically, King and Rogers) Lester implicated in Bozeman's robbery and murder, particularly given that his mother was not present during those portions of Lester's interviews. Relatedly, he argues that the trial court was required to make "specific findings" on these issues.

Lester's claims fail because he cites no legal authority to support either of his arguments. See Supreme Court Rule 22. See also *Collins v. State*, 308 Ga. 608, 612 n.4 (842 SE2d 811) (2020) ("[O]ther than a bare assertion" about the error raised, the

appellant's brief contained only "factual and legal argument" about a separate point that was part of the same enumeration of error; because appellant did "not provide citation to legal authority or legal analysis . . . , her argument . . . is deemed abandoned under Supreme Court Rule 22").

In any event, Lester's claims that his statements to law enforcement were not voluntary fail. First, at the *Jackson-Denno* hearing, the trial court specifically found that Lester "freely and voluntarily gave . . . statements" to law enforcement after voluntarily waiving his rights under *Miranda*, and Lester concedes on appeal that the trial court "applied a 'totality of the circumstances' test at the *Jackson-Denno* hearing."

Second, to the extent Lester complains about people he accused of being involved in the crimes being present during his own interview, the temporary presence of those people — without threats or other indicia of coercion — does not reach the level of "[c]oercive police activity — such as excessively lengthy interrogation, physical deprivation, and brutality" — that "is a necessary predicate to the

14

finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." *Dozier v. State*, 306 Ga. 29, 36 (829 SE2d 131) (2019) (citations and punctuation omitted).

Third, Lester also argues that "law enforcement officers were responsible for having Mr. Lester's mother removed from the [interrogation] room," contends that law enforcement took "affirmative action . . . to remove the mother of a juvenile being questioned," and implies that the alleged removal was somehow coercive to Lester. His legal analysis for why the trial court erred, however, appears to conflate the analysis of due process voluntariness (i.e., whether he was coerced) with whether the trial court appropriately applied the fourth *Riley* factor, which examines whether a juvenile was allowed to consult with relatives as one of many factors a trial court may consider as part of its determination that a juvenile's waiver of rights was voluntary or involuntary.

To the extent Lester's complaint about the lack of presence of one or both of his parents during his interviews with law

15

enforcement is focused on due process voluntariness, it is unavailing because presence of a parent is merely one factor a trial court should consider in its totality-of-the-circumstances evaluation of the voluntariness of a juvenile's statement. Here, the record shows that Lester's mother was present during Lester's waiver of rights and for almost an hour and a half of the interview; that her absence afterwards occurred after Lester acquiesced in her leaving, see *Heard v. State*, 287 Ga. 554, 557 (697 SE2d 811) (2010) (although parental absence "was a factor for the trial court to consider, . . . it was not determinative on the issue of voluntariness"); and that on several occasions during the *Jackson-Denno* hearing, the trial court asked about Lester's mother's presence and, before making its ruling, expressly commented on the voluntariness of the statements Lester made in front of his mother. And to the extent Lester's argument focuses on a single *Riley* factor, we have already rejected Lester's arguments that specific findings on any given *Riley* factor are required where, as here, the record supports the trial court's determination.

16

Finally, the trial court's ruling on the voluntariness of Lester's statements included all of the general findings that we have expressed a "preference for trial courts to make . . . if the evidence warrants them": "that the defendant was advised of each of his *Miranda* rights, that he understood them, that he voluntarily waived them, and that he thereafter gave his statement freely and voluntarily without any hope of benefit or fear of injury." *Brown v. State*, 294 Ga. 677, 680 (755 SE2d 699) (2014) (citation and punctuation omitted). The trial court was not required to make "explicit factual findings" beyond its general ruling on the voluntariness of Lester's statements, see *Cain*, 306 Ga. at 438, and Lester's claims of error fail.

3. Lester argues that the trial court erred in denying his "motion for mistrial" after the parties and the trial court realized that an alternate juror inadvertently retired with the jury for deliberations in violation of OCGA § 15-12-171. Lester is correct that OCGA § 15-12-171 was violated here, but we nonetheless conclude that the State met its burden of showing that the alternate

17

juror's presence during deliberations was harmless.

After the verdicts were published but before the jury was discharged, the District Attorney advised the trial court and defense counsel of his suspicion that an alternate juror had been present in the jury room during deliberations. The trial court sent the jury back to the jury room. During an ensuing colloquy, defense counsel expressed concern and requested that the court individually ask each juror if the alternate juror was present during deliberations. The court agreed and brought each juror back into the courtroom one by one, swore each juror in, and questioned each juror (other than the alternate) about whether the alternate was present during deliberations, whether the alternate participated in deliberations or voted on a verdict, and whether he influenced any juror's verdict.[9] At defense counsel's request, the court then sequestered each juror from the jurors who had not yet been questioned.

All of the jurors affirmed that the alternate juror had been

---

[9] As the State points out, OCGA § 24-6-606 (b) of our current Evidence Code — and its limitations on post-trial juror testimony — was not yet in effect. See, e.g., *Collins*, 308 Ga. at 610-611.

18

present in the jury room during deliberations. One juror recalled that the alternate did not participate in or say anything during deliberations; six jurors did not recall one way or the other whether the alternate participated in or said anything during deliberations; and five jurors recalled that the alternate did make comments or ask a question during deliberations, but none could recall anything specific that the alternate said. The foreperson and another juror told the trial court that the foreperson informed the alternate that he could not vote, and the ten jurors who were asked affirmed that the alternate did not vote. All 12 jurors affirmed that the alternate juror's presence during deliberations did not influence their verdicts. Defense counsel asked for an opportunity to research the issue further.

A week later, defense counsel filed a "Memorandum of Law in Support of Defendant's Oral Motion for Mistrial Regarding the Presence of the Alternate Juror During Jury Deliberations." Three weeks later, the trial court entered an order purporting to deny

19

Lester's "motion for mistrial."[10]  Three months after that, the trial court entered Lester's judgment of conviction and sentences. Several days later, Lester filed a generic motion for new trial, and nine years later, current appellate counsel filed an amendment to Lester's motion for new trial that specifically raised several issues, including the admissibility of Lester's statements to law enforcement and Lester's claim that "[t]he [trial c]ourt erred by denying [his] motion for mistrial based on the alternate juror[] being present during deliberations in the jury room contrary to Georgia law."  The trial court then denied Lester's motion for new trial as amended.

(a) Before reaching the merits of this enumeration, we first assess whether Lester properly preserved for appellate review his claim about the presence of the alternate juror violating OCGA § 15-12-171.  Lester frames his argument in terms of the trial court's erring by denying his motion for mistrial; the State responds that

---

[10] We explain the procedural considerations related to Lester's motion for mistrial below in Division 3 (a).

20

the issue was waived because Lester did not move for a mistrial at the first practicable moment, i.e., when defense counsel first discovered that the alternate juror had been present for deliberations. But under these circumstances, a defendant cannot waive a complaint about this type of error by not moving for a mistrial. That is because the alternate-juror issue only became known to the parties, and to the trial court, after a verdict was returned in the case, and we have held that a motion for mistrial after a verdict is rendered is improper. See *Medina v. State*, ___ Ga. ___, ___ (844 SE2d 767) (2020) ("'Once the jury returns its verdict, the trial has ended and the time for granting a mistrial has passed,' so a purported mistrial granted 'after the jury had returned its verdict resulted in a void order.'") (quoting *State v. Sumlin*, 281 Ga. 183, 184 (637 SE2d 36) (2006)). See also *Carter v. State*, 273 Ga. 428, 430 (541 SE2d 366) (2001) (where defendant alleged improper communication between the trial court and the jury, although the defendant "did not object to the trial court's communication prior to the return of the verdict, . . . the record does not show that [he] knew

21

of the trial court's unauthorized colloquy with the jury, so the error was not waived"); *Pennie v. State*, 271 Ga. 419, 420, 423 (520 SE2d 448) (1999) (where "juror apparently notified the court that a spectator in the courtroom had attempted to speak to that juror in the hallway," identifying "no waiver of appellate review" where the defendant "undisputedly had no knowledge of the irregularity in the trial proceedings until after the verdict was rendered").

The proper vehicle for Lester's alternate-juror claim was a motion for new trial. See *Sumlin*, 281 Ga. at 184 (a motion for mistrial, "by its very nature, seeks to end the trial proceedings before a verdict is rendered" and "is not to be confused with a motion for new trial, which is the appropriate vehicle through which to pursue a retrial after the verdict has been rendered"). Lester was required to pursue that potential remedy no later than 30 days after the entry of judgment. See OCGA § 5-5-40 (a); *Southall v. State*, 300 Ga. 462, 464-467 (796 SE2d 261) (2017).

Here, Lester's counsel did file a motion for new trial within 30 days after the judgment, and later filed an amended motion for new

22

trial that expressly raised the alternate-juror issue. Lester therefore submitted a filing on the relevant issue within the time period that would have been required to file a valid motion for new trial. And the trial court ruled on the issue by denying the motion for new trial. Under these circumstances, Lester's alternate-juror claim has been preserved for our review, and we may evaluate it on the merits.

(b) Lester argues that the presence of the alternate juror during deliberations violated OCGA § 15-12-171, resulting in a presumption of harm that the State cannot overcome because it was undisputed that the alternate remained with the jury throughout deliberations and that some jurors[11] affirmed that the alternate participated in the deliberations by making comments or asking questions. Although we agree that the alternate's presence during jury deliberations violated OCGA § 15-12-171, we conclude that the

---

[11] Lester claims that "each juror affirmed (with the exception of two) that the alternate did, in fact, participate in deliberations," but the record shows that only five jurors stated that the alternate participated in deliberations by making comments or asking questions.

23

State met its burden of rebutting the presumption of harm by showing that the alternate did not influence the jury's verdicts, and that the trial court did not err by denying a motion for new trial on this basis.

Under OCGA § 15-12-171, "[u]pon final submission of the case to the jury, the alternate jurors shall not retire with the jury of 12 for deliberation but may be discharged. . . ." If the trial court deems it advisable to keep one or more of the alternate jurors available, however, "it may direct that one or more of the alternate jurors be kept in the custody of the sheriff or one or more court officers, separate and apart from the regular jurors, until the jury has agreed upon a verdict." Id. "[T]here is a rebuttable presumption of harm to the defendant if an alternate juror sits in on the jury's deliberations over the defendant's objections." *Coley v. State*, 305 Ga. 658, 663-664 (827 SE2d 241) (2019) (citation and punctuation omitted).

Lester argues that, to overcome the presumption of harm, the State was required to prove that the alternate juror did not

*participate* in deliberations, even if the evidence shows that the jury's verdict was not influenced as a result. Lester insists that under *Johnson v. State*, 235 Ga. 486, 494-495 (220 SE2d 448) (1975), the State falls short of meeting its burden if it fails to present affirmative evidence that the alternate juror did not participate in deliberations *and* that the jury was not influenced by the alternate juror's presence.[12] But we do not read *Johnson* as effectively establishing a mandatory presumption of harm whenever the

---

[12] Lester relies on *Johnson*'s quotation from *United States v. Allison*, 481 F2d 468, 472 (5th Cir. 1973), that "'[s]ufficient prejudice and effect on the jury's verdict would be shown and, therefore, a new trial required'" if the alternate juror "'in any way participated in the jury deliberations, or if any regular juror was deterred in the free exercise of his independence of thought, expression, or action by the mere presence of a non-participating alternate during deliberations.'" *Johnson*, 235 Ga. at 494. But *Allison* did not advance a strict two-pronged, disjunctive "participation or influence" test as Lester argues. Instead, it outlined a number of factual considerations — such as whether the alternate participated in deliberations, voted, indicated his views "orally or otherwise," or "restrained any of the regular jurors in expressing his views or in exercising his independence of thought and action" — and directed the district court in that case to conduct an evidentiary hearing to make further findings of fact. *Allison*, 481 F2d at 472. Then, in its later opinion after remand, *United States v. Allison*, 487 F2d 339, 339 (5th Cir. 1973), the Fifth Circuit focused on the ultimate question of whether the jurors and the verdict were influenced by the alternate juror's presence and affirmed the district court's denial of a new trial on the basis that they were not.

alternate juror merely "participates" in deliberations. When the same issue later arose in *State v. Newsome*, 259 Ga. 187 (378 SE2d 125) (1989), and the presence of the alternate juror during deliberations was undisputed, we neither ruled on nor required the trial court to rule on the issue of participation.[13] Instead, we cited *Johnson* in holding that "the presence of the alternate juror was harmless error" because the jurors' "affidavits establish[ed] that the alternate juror did not influence any juror, or the verdict of the entire jury." *Newsome*, 259 Ga. at 188. See also *Bullock v. State*, 150 Ga. App. 824, 826 (258 SE2d 610) (1979) (unlike in *Johnson*, there was "no . . . showing of harmlessness . . . made or attempted by the state" where "the trial court merely asked the foreman whether the alternate juror had participated in the vote or the deliberations" and "the foreman replied in the negative"; the court

---

[13] We also note that there is no clear definition of what constitutes "participation" for purposes of this argument. See, e.g., *Allison*, 481 F2d at 472 (not defining "participation" and listing a number of other factors that courts should evaluate separate from the "participation" factor); *Johnson*, 235 Ga. at 495 ("The mere fact that the alternate juror admits that he looked at some of the evidence is insufficient to rise to the level of participation which caused a reversal" in another federal case).

did "not consider this a showing that none of the jurors were influenced in any way by the alternate's presence").

It is true that in *Eller v. State*, 303 Ga. 373, 379-380 (811 SE2d 299) (2018), we cited both *Newsome* and *Johnson* for the proposition that "there is a presumption of harm to the defendant that the State must overcome by presenting affirmative evidence that the alternate juror did not participate in deliberations and that the jury was not influenced by the alternate juror's presence." (citation and punctuation omitted). But we similarly do not view *Eller* as establishing a requirement for the State to offer affirmative evidence of no participation *and* no influence when *Johnson* did not establish such a rule. That is especially so given that *Eller* also cited *Newsome* and is not inconsistent with *Johnson* on the ultimate question of whether a verdict was influenced by the presence of an alternate juror.

This makes good sense: where an alternate juror does not participate in deliberations *and* does not influence the verdict in any other way, then a defendant cannot suffer prejudice from the

27

alternate's presence during jury deliberations; the ultimate question of influence on the verdict has been answered, and the presumption of harm has been rebutted. But we now clarify that the same ultimate question of influence on the verdict may be answered if a trial court finds that the State met its burden of showing that no juror was influenced by an alternate juror's presence and the record supports that the finding is not clearly erroneous. Although an alternate's participation in deliberations is one type of evidence — and potentially a significant type of evidence — that is relevant to the question of influence, it is not the only or ultimate evidence that a trial court should consider in evaluating whether a violation of OCGA § 15-12-171 was harmless. See *Eller*, 303 Ga. at 380 (summarizing juror affidavits as stating, among other things, that the alternates did not participate in deliberations); *Newsome*, 259 Ga. at 187-188 (not requiring evidence of non-participation but relying on juror affidavits otherwise establishing lack of influence); *Johnson*, 235 Ga. at 494-495 (evaluating evidence of participation in deliberations, which was explained as something more than merely

looking at some of the physical evidence). We therefore disapprove any reading of *Johnson*, *Eller*, or any Court of Appeals opinion, including *Chandler v. State*, 309 Ga. App. 611, 614 (710 SE2d 826) (2011), and *London v. State*, 260 Ga. App. 780, 781 (580 SE2d 686) (2003), as holding that there is a per se requirement to prove that an alternate juror did not participate in deliberations in addition to not influencing the verdict.

In light of this clarification, we conclude that the State met its burden of proving that the presence of the alternate juror during deliberations was harmless error. See *Newsome*, 259 Ga. at 188. Immediately after deliberations concluded and the verdict was returned, the trial court individually questioned the 12 regular jurors; it was undisputed that the alternate juror was informed he could not vote and that he in fact did not vote; and even among the five jurors who said that the alternate juror did make comments or ask questions during deliberations, none could recall anything that the alternate said. Moreover, all 12 of the jurors affirmed that the presence of the alternate did not influence their verdicts. Given this

29

record, and in light of the legal standard we clarify today, the trial court did not err in refusing to order a new trial based on the presence of the alternate juror during deliberations.

*Judgment affirmed.  All the Justices concur.*


Decided October 5, 2020.

Murder. Tift Superior Court. Before Judge Reinhardt.
*Harold B. Baker*, for appellant.
*C. Paul Bowden, District Attorney, Jennifer D. Hart, Robert A. Rogers, Patrick Warren, Assistant District Attorneys; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Meghan H. Hill, Assistant Attorney General*, for appellee.