**THIRD DIVISION**
**DOYLE, P. J.,**
**REESE, P. J., and BROWN, J.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
https://www.gaappeals.us/rules

*DEADLINES ARE NO LONGER TOLLED IN THIS COURT. ALL FILINGS MUST BE SUBMITTED WITHIN THE TIMES SET BY OUR COURT RULES.*

**April 1, 2021**

# In the Court of Appeals of Georgia

A21A0425. WILLIS v. THE STATE.

BROWN, Judge.

Travion Willis appeals from his convictions of armed robbery, kidnapping, aggravated assault, possession of a firearm during the commission of a crime, and theft by taking a motor vehicle. He contends that the State failed to disprove beyond a reasonable doubt his affirmative defense of coercion and that the trial court erred by admitting into evidence his inculpatory statement to police. We affirm.

This is the second appearance of this case before this Court. In its first appearance, this Court affirmed the trial court's grant of a new trial to Willis and his co-defendant Christopher Wakefield, and dismissed as moot Willis' challenge to his sentence. See *State v. Wakefield*, 324 Ga. App. 587 (751 SE2d 199) (2013) ("*Wakefield I*"). Both men were retried together and again convicted. In *Wakefield v.*

*State*, ___ Ga. App. ___ (Case No. A19A0655) (May 17, 2019) (unpublished) ("*Wakefield II*"), we affirmed Wakefield's conviction and summarized the evidence as follows:

Viewed in the light most favorable to the jury's verdict, the evidence shows that in June 2008, Joshua Askew was employed by his father's amusement gaming company, which placed coin-operated gaming machines in bars, restaurants, and gas station convenience stores, and split the money from these games with the venues. One of Askew's responsibilities with the company was to collect the proceeds from the games and then divvy them up with the venue owner.

On the afternoon of June [16], 2008, Askew had collected approximately $8,000 from five venues when he arrived at a [Shell] gas station at the intersection of Highways 85 and 314 in Fayetteville. Then, after collecting the money from that station's games, Askew exited the convenience store and walked toward his SUV, while looking down at his mobile phone. But before Askew reached his vehicle, he was confronted by two men, one of whom—later identified as Travion Willis—pointed a handgun at his chest and demanded that he turn around. Askew complied, and Willis took the money from his pocket and the other man—later identified as Wakefield—filched his phone. Willis then ordered Askew to get into the trunk of a silver Chevrolet Impala parked next to Askew's SUV, and Askew again complied.

Subsequently, Willis got behind the wheel of the Impala, Wakefield entered Askew's SUV, and both vehicles then left the gas station. But within only a few minutes, the Impala came to a halt as a result of Willis rear-ending Askew's SUV. And seizing the opportunity to escape, Askew pulled the interior-trunk release, jumped out of the Impala's trunk, and ran to the vehicle of another motorist, who had stopped because of the accident, to ask for help. Wakefield, still driving Askew's SUV, and Willis, still driving the Impala, sped off. Askew and the assisting motorist briefly pursued them but quickly lost contact with the vehicles and, thus, returned to a nearby shopping center parking lot to wait for the police.

Shortly thereafter, a dispatched police officer arrived. And while taking Askew's statement, the officer began receiving calls about a vehicle matching Askew's description of the silver Impala being seen in a neighborhood a short distance away. Immediately, the officer went to the scene and found a silver Impala—with a Florida license plate and its engine still running—that had apparently become stuck in a drainage culvert while attempting to back out of a driveway. A resident of a neighboring home informed the officer that she had seen the driver exit the vehicle and then attempt to break the driver-side window with a rock after seemingly locking himself out. But upon being unable to do so, the driver fled into the nearby woods. Given this information, the officer radioed for a perimeter to be set up in the area, and not long after receiving several calls about a suspicious person running through the woods, the police apprehended Willis. Additionally, in searching the Impala, the first responding officer recovered a handgun, and, around

the same time, police found Askew's SUV abandoned less than a mile away.

After running the Impala's license plate through the GCIC, the investigating police officers determined that the vehicle had been rented from a company in Jacksonville, Florida, by Wakefield's aunt, who later reported it stolen. And during the officers' questioning of Willis, he admitted being involved in the armed robbery and kidnapping of Askew but claimed that Wakefield forced him to participate in the crimes. Approximately one week later, police officers arrested Wakefield, who at the time was still in possession of some of the cash stolen from Askew.

The State later charged Wakefield and Willis, via the same indictment, with one count each of armed robbery, kidnapping, aggravated assault, possession of a firearm during the commission of a crime, and theft by taking. The case then proceeded to trial, during which the State presented the evidence discussed *supra*. In addition, Wakefield testified in his own defense. Specifically, although he acknowledged that his aunt rented a car on his behalf so he could drive to the Atlanta area to see his child, he claimed the car was stolen from a gas station and that he neither knew Willis nor had anything to do with the armed robbery and kidnapping.

(Footnote omitted.) *Wakefield II*, Slip Opinion at 1-4.

4

Willis, who was 17 at the time of the armed robbery, also testified in his own defense and claimed that he met Wakefield sometime in 2008, but did not know his name; Willis knew Wakefield only as "boss" or "boss man." Willis saw Wakefield at least ten times between March 2008 and June 2008, including the evening before the armed robbery, June 15, 2008, when Willis agreed to go with Wakefield the next day to meet up with some girls. Willis could not recall the date but acknowledged that Wakefield had previously asked him to "join[ ] [Wakefield] to rob somebody," but Willis said no because he was on probation and did not want to go back to jail.

On the morning of June 16, 2008, Wakefield picked up Willis and the two drove around in the Impala for "[a] few hours," waiting for the girls to call. They stopped at several places including the Shell gas station, where Willis heard the cashier tell Wakefield, "don't hurt him or nothing." Willis thought the cashier was talking about him and took it as a joke. The two left the Shell gas station, visited a second gas station, and then a Big Lots, where Willis waited in the car for thirty minutes while Wakefield went inside the store. The two continued driving around and then Wakefield received a call and responded that he was on the way. At that point, the two men returned to the Shell gas station and committed the armed robbery and kidnapping of Askew.

According to Willis, when the two men pulled up to the gas station, Wakefield pulled out a gun and said to Willis, "you see that cracker right there, put him in the car; put him in the trunk of the car." Willis responded that he "want[ed] nothing to do with that." According to Willis, Wakefield pulled a second gun and responded "you ain't got no choice; if you don't, I'll kill him, I'll do it myself."[1] Willis testified that Wakefield pointed the gun at him; that he was scared for his life; and that he did not want to rob Askew, but that Wakefield forced him to do it. Willis later testified that Wakefield told him he would kill him, and that Willis thought about running but was scared Wakefield would shoot him in the back. After the two vehicles fled the gas station, Willis testified that Wakefield came up next to him in Askew's SUV, pointed his gun through the window, and then cut in front of Willis, at which point the two vehicles collided.

Willis testified that he told police that Wakefield threatened him and that he was scared but acknowledged that he lied to police about Wakefield's identity

---

[1] Askew testified that only Willis had a gun during the robbery and that he did not see a second gun, but acknowledged on cross-examination that he did not know whether Wakefield had a gun. During their investigation, police recovered only one gun from the Impala. Willis testified that Wakefield had a gun, but that he did not know if the gun was on Wakefield's person or inside the Impala, though he "doubt[ed] if [Wakefield] left it in the car." At the time Willis pointed his gun at Askew, Wakefield was not pointing a gun at Willis.

because he was afraid Wakefield would come after his family; Willis told police that "Jerry" was involved in the incident. He admitted to participating in the robbery but told police he "felt [he] didn't really have a choice." Willis also stated that he ran from the abandoned Impala and police because he was scared that he would be arrested on an outstanding warrant for violating "misdemeanor probation."

1. Willis asserts that insufficient evidence supports his convictions because the State did not disprove coercion. We disagree.

Under OCGA § 16-3-26, a person cannot be guilty of any crime except murder "if the act upon which the supposed criminal liability is based is performed under such coercion that the person reasonably believes that performing the act is the only way to prevent his imminent death or great bodily injury." "Coercion is an affirmative defense, and the burden rests with the State to disprove coercion beyond a reasonable doubt." (Citation and punctuation omitted.) *Blocker v. State*, 265 Ga. App. 846, 851 (5) (595 SE2d 654) (2004). "Whether a defendant is coerced into acting, however, is a question for the trier of fact." *Engrisch v. State*, 293 Ga. App. 810, 812 (668 SE2d 319) (2008).

In this case, the State elicited testimony from Willis that he had several opportunities throughout the incident to ask for help from police because he feared

7

for his life. Willis acknowledged that he abandoned the Impala in front of a house with a police car, but instead of running up to the house to ask for help, he ran from the house. He also confirmed that after running from the Impala, he came upon a house where the occupant allowed him to use her telephone. Instead of calling police as he feared for his life, Willis called his aunt, told her he had been out swimming with friends and was stranded, and asked her to pick him up. As Willis waited for his aunt at the home, a police car pulled up; rather than speaking with police, Willis ran. When police apprehended Willis a short time later, he did not tell them that he had been coerced by Wakefield but instead lied and told them that "the other person involved [in the incident] was named Jerry" and then lied about where Jerry lived. Willis also lied to police in his description of Wakefield. Willis claimed that he lied in order to protect his family from Wakefield but admitted that Wakefield never threatened his family.

A jury is not required to believe the defendant's testimony that he was coerced. See *Engrisch*, 293 Ga. App. at 812. See also *Blocker*, 265 Ga. App. at 852 (5) (it is jury's prerogative to disbelieve a defendant's testimony; such is the assumed risk when a defendant chooses to testify); *Aleman v. State*, 227 Ga. App. 607, 609 (1) (489 SE2d 867) (1997). Although Willis claimed at trial and claims on appeal that he

8

"attempted to flee at the earliest possible opportunity when he did not believe he would be immediately murdered by Wakefield," the jury was not required to believe him. We find that a reasonable finder of fact could conclude that the State disproved Willis' coercion defense based upon his repeated failures to seek help from police despite multiple opportunities to do so.[2] See, e.g., *Jackson v. State*, 354 Ga. App. 225, 228 (1) (840 SE2d 609) (2020) (State used opportunity to escape to disprove coercion).

2. Willis contends that the trial court erred in admitting his custodial statement because he was a minor and not afforded the opportunity to have his family or an attorney present. We disagree.

"The question of a voluntary and knowing waiver depends on the totality of the circumstances and the state has a heavy burden in showing that the juvenile did understand and waive his rights. Confessions of juveniles are scanned with more care and received with greater caution." (Citation and punctuation omitted.) *Nelson v.*

---

[2] Although not enumerated as error, Willis contends that the trial court should have granted him a new trial pursuant to OCGA §§ 5-5-20 and 5-5-21, the "general grounds." We disagree. "[T]he trial court alone is the 'arbiter of the general grounds.' Having found the evidence sufficient above, we have no basis to disturb the trial court's denial of [Willis' amended] motion for new trial on the general grounds." (Citation and punctuation omitted.) *Wilcox v. State*, ___ Ga. ___ (2) (Case No. S20A1173, decided November 16, 2020).

*State*, 289 Ga. App. 326, 328 (1) (657 SE2d 263) (2008). See also *Lester v. State*, ___ Ga. ___ (2) (849 SE2d 425) (2020). Willis contends that the admissibility of his statement should be analyzed using the nine factors set forth in *Riley v. State*, 237 Ga. 124, 128 (226 SE2d 922) (1976). But, our Supreme Court has "recognized that *Riley* does not apply to the admissibility of statements by persons who have reached the age of 17 because such persons are no longer considered juveniles by our criminal justice system." *Woodard v. State*, 277 Ga. 49, 50 (2) (586 SE2d 330) (2003) (defendant was 17 years and 10 months old at the time he made his statement to police), citing *Reynolds v. State*, 275 Ga. 548 (3) (569 SE2d 847) (2002).[3] Accordingly, Willis'

---

[3] We note that *Reynolds* cited the pre-amendment version of OCGA § 15-11-2, which defined "[c]hild" as "any individual who is: (A) Under the age of 17 years; [or] (B) Under the age of 21 years, who committed an act of delinquency before reaching the age of 17 years, and who has been placed under the supervision of the court or on probation to the court[.]" OCGA § 15-11-2 (2). See *Reynolds*, 275 Ga. at 548 (3), n.4. The current version of OCGA § 15-11-2 pertinently defines "[c]hild" as "any individual who is: (A) Under the age of 18 years; [or] (B) Under the age of 17 years when alleged to have committed a delinquent act[.]" OCGA § 15-11-2 (10). A "[d]elinquent act" is defined, in pertinent part, as "[a]n act committed by a child designated a crime by the laws of this state, or by the laws of another state if the act occurred in that state, under federal laws, or by local ordinance, and the act is not an offense applicable only to a child or a juvenile traffic offense[.]" OCGA § 15-11-2 (19) (A). *Reynolds* also cited subsections (b) and (d) of the pre-amendment version of OCGA § 15-11-28 which defined "child" as an individual 13 to 17 years of age; the current version of that statute, OCGA § 15-11-560, retains that definition. Accordingly, even under the current versions of OCGA §§ 15-11-2 and 15-11-28, *Riley* would not apply here because Willis was not under the age of 17 when he

statement to police "was admissible if made voluntarily, without being induced by hope of benefit or coerced by threats." *Woodard*, 277 Ga. at 50 (2).

During the *Jackson-Denno* hearing, it was determined that Willis, like the defendant in *Woodard*, was 17 years and 10 months old at the time of the incident. The lead detective testified that Willis was read his *Miranda* rights twice: Once at the time he was apprehended because "he was anxious to talk" to the arresting officer about the incident, and then again two to three hours later at the police station when the detective conducted a custodial interview. Willis signed the waiver form, and indicated that he understood his rights. The detective confirmed that he did not offer Willis any hope of benefit, threaten him in any way, or force him to speak. In his statement, Willis admitted to participating in the armed robbery and kidnapping of Askew, but said that "Jerry had held a gun to his head and forced him to commit the [crimes]." The detective opined that based on his experience in conducting over 200

committed the crimes at issue. Even if *Riley* were to apply here, however, we would find no error in the trial court's conclusion that Willis knowingly and voluntarily waived his rights, as reflected in the facts established during the *Jackson-Denno* hearing, discussed in greater detail later in this division, infra. See *Lester*, ___ Ga. at ___ (2). See also *Murray v. State*, 276 Ga. 396, 397-398 (2) (578 SE2d 853) (2003) (applying *Riley* factors and concluding that trial court did not abuse its discretion in admitting statement of defendant, who was 15 years of age at the time of his custodial interrogation; in the ninth grade; fully advised of his *Miranda* rights; informed why he was custody; and did not ask to speak with his parents).

custodial interviews, Willis understood the *Miranda* warnings, his predicament, and what was going on "just as well as an adult."

The trial court noted that Willis was just shy of 18 years old, and ruled that his statement was freely and voluntarily given; that he had been properly advised of his *Miranda* rights; that he made a knowing and intelligent waiver of those rights; and that he was not offered any hope of benefit or threatened in any way. "[U]nless clearly erroneous, a trial court's findings as to factual determinations and credibility relating to the admissibility of the defendant's statement at a *Jackson-Denno* hearing will be upheld on appeal." (Citations and punctuation omitted.) *Johnson v. State*, 301 Ga. 707, 711 (III) (804 SE2d 38) (2017). Under the totality of the circumstances, the trial court did not err by finding that Willis freely, knowingly, and voluntarily waived his rights and that his custodial statement was admissible at trial. See *Woodard*, 277 Ga. at 50-51 (2) (affirming trial court's admission of defendant's custodial statement, and rejecting defendant's claim that it was not freely and voluntarily given because no attempt was made to locate his parents and he was not asked if he wanted a parent or guardian present).

*Judgment affirmed. Doyle, P. J., and Reese, P. J., concur.*